PRO SE OFFICE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/3/11_

Darrick Grimes and Yolanda Grimes,
On behalf of themselves and a class of
others similarly situated

                         Plaintiffs, Pro Se

                    v.

CASE N).: 1024-CV-08
(KMK)

Fremont General Corporation, Fremont Investment
and Loan, WCS Lending LLC, Jonathan Tanenbaum,
Nadene McBean, America's Servicing Company,
U.S. Bancorp and U.S. Bank, National Association,
as Trustee for Master Asset Backed Securities Trust
2006-FRE-1, "John Doe" and "Jane Doe," the last
two names being fictitious, said parties being individuals,
if any, having any involvement in the fraud perpetrated on
plaintiffs, and XYZ-1 Corporation and XYZ-2 Corporation,
the last two names being fictitious, it being the intention of
the plaintiffs to designate any corporation or entity having any
Involvement in the fraud perpetrated on plaintiffs' described
herein.

                         Defendants.

_____x

### SECOND AMENDED COMPLAINT
### FOR DECLARATORY AND
### INJUNCTIVE RELIEF AND DAMAGES

1)     COMES NOW, PLAINTIFFS, **DARRICK GRIMES** and **YOLANDA P. GRIMES**, hereinafter referred to as "Plaintiffs" or "the GRIMES" file this civil action alleging that their federal and state civil rights were violated herein, and states as follows:

2)     Plaintiffs file this Second Amended Complaint pursuant to the provisions of Title VIII of the Civil Rights Act of 1866, 42 U.S.C. §1981, §1982, §1983 ("Civil Rights Act"), and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Civil Rights Act of 1866 and 1870, and later expanded upon in 1991 and also alleges claims for

violation of the Federal Fair Debt Collection Practices Act, 15 U.S.C. 1692(e).  It is brought by the mortgagors who have been sued by the defendant, U.S. Bank, N.A. as Trustee for MASTR Asset Backed Securities Trust 2006 FRE-1 to foreclose on their property.

## THE PARTIES

Darrick Grimes and Yolanda Grimes are African-Americans homeowners who face the possibility of losing their home because, they fell prey to a complex predatory lending scheme to defraud them using a classic "***bait and switch***" tactics.  They were defrauded through deception, false promises and forgery of signatures on mortgage loan application and related pre-disclosure documents as well as other deceptive and fraudulent sales practices and acts of falsifying documents and misrepresentation relative to obtaining a mortgage.  As a result of defendants' wrongful acts and omissions, Plaintiffs have suffered significant losses and damages due to predatory lending scheme.

Darrick Grimes is an African-American male who currently lives in Newburgh, New York.  Yolanda Grimes is an African-American female who currently lives in Newburgh, New York for the past five years (the "**Plaintiffs**" . They currently reside in their home located at 23 Stacy Lee Drive, Newburgh, NY 12550 (the "**Subject Property**") which is the home they have resided in since October 29, 2005.

Upon information and belief, Fremont General Corporation is a financial services holding company listed on the NYSE and organized under the laws of the State of Nevada and maintains its principal place of business at 2425 Olympic Boulevard, 3rd Floor, Santa Monica, California 90404 ("**Fremont General**"), which engages in real estate lending operations primarily through its wholly owned subsidiary, Fremont Investment and Loan.   The Company's lending operations consist of wholesale origination of non-prime or "subprime" residential real estate loans on a nationwide basis, which are then primarily sold to third-party investors or securitized.   These subprime loans are generally made to borrowers who do not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.

2

Upon information and belief, Fremont Investment and Loan is a wholly owned subsidiary of Fremont General Corporation and is organized under the laws of the State of California and maintains its principal place of business at 2727 East Imperial Highway, Brea, California 92821 ("**Fremont Investment and Loan**"), that regularly originates and purchases loan secured by homes in the State of California and nationwide.

Upon information and belief, Fremont Investment and Loan was authorized as a licensed mortgage banker in the State of New York and is and has been at all relevant times a wholly owned subsidiary of Fremont General.

Upon information and belief, at all relevant times prior to the commencement of this lawsuit, Fremont Investment and Loan was owned, dominated and controlled by Fremont General.

Upon information and belief, Fremont Investment and Loan structured loan products where borrowers were qualified for adjustable rate mortgages based upon the initial "teaser" lower interest rate, without regard to their ability to repay the debt back at a higher adjustable interest rate where monthly mortgage payments would increase with the adjustment rate.

Upon information and belief, WCS Lending LLC is a licensed mortgage broker under the laws of the State of Florida and maintains its principal place of business at 6501 Congress Avenue, Boca Raton, Florida 33487 ("**WCS Lending**").

Upon information and belief, WCS Lending is organized under the laws of the State of Florida and is a licensed mortgage broker in the State of New York.

Upon information and belief, Nadene McBean ("**McBean**") is a former employee of defendant, WCS Lending and was an employee on October 12, 2005.

Upon information and belief, Jonathan Tanenbaum ("**Tanenbaum**") was a licensed mortgage broker in the State of Florida and an employee of defendant, WCS Lending. His business address, on information and belief, is 6501 Congress Avenue, Boca Raton, Florida 33487 and he was an employee and mortgage broker of WCS

Lending on October 12, 2005.  Mr. Tanenbaum regularly solicits mortgage loans in the State of Florida and nationwide.

Upon information and belief, Jonathan Tanenbaum and WCS Lending acted as agents of Fremont Investment and Loan in carrying out the acts described conduct in this complaint.

Upon information and belief, American Servicing Company is the loan servicing company of Wells Fargo & Company, NA, and is a wholly owned subsidiary of Wells Fargo & Company, N.A.   America's Servicing Company is not named as a Defendant to this action. Upon information and belief, American Servicing Company is organized under the laws of Iowa and maintains its principal place of business at One Home Campus, X2302-02J, Des Moines, Iowa 50328. ("**America's Servicing Company**").

Upon information and belief, U.S. Bank, National Association is a national banking association and, acts as Trustee for Master Asset Backed Securities Trust 2006 FRE-1 and/or any assignee and is organized under the laws of the State of South Carolina. ("**U.S. Bank**").  U.S. Bank is and was, at all times material hereto, authorized to conduct business in the State of New York and doing business in the State of New York.

Defendant WCS Lending is a Florida limited liability company doing business in the Boca Raton, Florida as WCS Lending, among other names, with a place of business in Boca Raton, Palm Beach County, Florida and authorized to conduct business in the State of New York. It operates as a mortgage brokerage business pursuant to a Florida Office of Financial Regulation. Defendants WCS Lending, Tanenbaum, and McBean, and DOES are collectively referred to as the ("**WCS Lending**").

Defendant Nadene McBean ("**McBean**") is an individual who at relevant times was employed by WCS Lending and operated in Palm Beach County as a salesperson/mortgage broker of Tanenbaum/WCS Lending.

4

Defendant Fremont Investment and Loan, was, at all times material hereto, an industrial charted bank organized in the State of California and doing business in the State of New York.

Defendant Fremont General Corporation, a defunct entity, is and was, at all times material hereto, the parent company of the "Originator" of the "subject loan". Fremont and Investment and Loan ceased to exist as a lender on or about July 2, 2008.

Defendant Fremont Reorganization Corporation a/k/a Fremont Investment and Loan, a defunct entity, is and was, at all times material hereto, the "Originator" of the "subject loan". Fremont Reorganization Corporation and Fremont General Corporation a/k/a Fremont Investment and Loan filed for bankruptcy protection in June, 2008 and emerged from bankruptcy or about May 2010.

Mortgage Electronic Registration Systems, Inc. (MERS) is and was, at all times material hereto, a corporation organized in the State of Delaware and doing business in the State of New York, but is not named as a party to this action.

Defendant MASTR ASSET BACKED SECURITIES TRUST 2006-FRE-1 is and was, at all times material hereto, a corporation organized in the State of Delaware and doing business in the State of New York (the "Defendant Trust").

The true names and capacities, whether individual, corporate, associate, governmental, or otherwise, of defendants DOES 1 through 100 are unknown to plaintiff at this time. Plaintiffs, therefore sues said defendants by such fictitious names. When the true names and capacities of said defendants have been ascertained, Plaintiffs will amend this complaint accordingly. Plaintiffs are informed and believes, and on that basis alleges, that each defendant designated herein, including each DOE, is responsible, willfully, negligently, or in some other actionable manner, for the events and happenings, and violations of New York law, hereinafter alleged, and that they caused Plaintiffs and the class members harm and damages.

5

Plaintiffs' alleges on information and belief that at all times relevant hereto each of the Defendants was the agent, servant, employee, joint-venturer, partner, successor-in-interest, and/or co-conspirator of each other defendant and was at all said times acting in the full course and scope of said agency, service, employment, joint venture, concert of action, partnership, successorship, or conspiracy.

## INTRODUCTION AND PRELIMINARY STATEMENTS

## STATEMENT OF THE CASE

3)     The allegations set forth in this Second Amended Complaint (the "Complaint") are based on the investigation undertaken by the Plaintiffs. This investigation has included, among other things: review and analysis of internal, non-public Fremont General Corporation ("Fremont General," "Fremont," or the "Company") documents obtained through the investigation; includes detailed interviews with numerous former employees of Fremont and other persons with knowledge of the events alleged herein; analyses by experts in the fields of banking regulation, mortgage finance, accounting, and loss causation; analyses of hundreds of millions of loan records reported by Fremont pursuant to the Home Mortgage Disclosure Act ("HMDA"); review of Fremont and other relevant company filings with the Securities and Exchange Commission ("SEC"); review of guidance issued by the federal banking regulatory authorities; examination of Fremont's communications with the Federal Deposit Insurance Corporation ("FDIC"); examination of generally accepted accounting principles in the United States ("GAAP"); review of the Fremont and other relevant websites; and examination of Fremont and other relevant company press releases, news articles and analyst reports.

4)     The bulk of this information – such as witness statements from former Fremont insiders and non-public Fremont documents and analysis of key Fremont data – was not previously available, or disclosed, to the investing public. The results of the investigation by the Plaintiffs are discussed throughout this Complaint in reference to securities litigation case titled Mohammed Al-Beitawi vs. Fremont General Corporation et al., United States District Court of Southern District Case No.:CV 07-5756 FMC (FFMx)) (AMENDED CONSOLIDATED CLASS ACTION SECURITIES COMPLAINT ).

5)   The Defendants named in this Second Amended Complaint worked in conjunction with Fremont and WCS Lending to commit, and exponentially expand, the single largest financial fraud in history. Every dollar the Defendants purportedly "earned," and every dollar they kept to unjustly enrich themselves, was stolen money.

6)   This is a case in which sophisticated subprime mortgage lenders, mortgage brokers and Securitized MBS Trust engaged in a systematic, purposeful enterprise with MERS to maintain and profit from a fraud and wrongly enrich themselves. The Defendants had actual and constructive knowledge of mortgage fraud and cannot deny their knowledge of many "red flags" indicating the likelihood of that fraud. This case goes well beyond "red flags."

7)   The Defendants did not properly, independently, and reasonably perform due diligence into the many red flags strongly indicating certain subprime lenders were engaging in wrongdoing that was a fraud. The Defendants did exactly the opposite. The Defendants misled regulators, investors, and potential investors and generally looked the other way, focusing only on self-interest and profit.

8)   This Second Amended Complaint includes new allegations and causes of actions against Defendant Trust and the role of the Trustees, as well as claims against additional Defendants.

9)   Fremont's subprime account executives held derogatory stereotypes of African Americans, which contributed to their targeting of African Americans in and around the United States and in New York City, particularly in Queens County for subprime loans.

10)   While the Plaintiffs are a married couple, they are typically representative of other African-American and Hispanic or Latino borrowers that fell prey to the same violations outlined and covered by this Second Amended Complaint.

11)   At all times material hereto, all Defendants operated through a common plan and scheme designed to conceal the material facts set forth below from Plaintiffs, from the New York consumers and borrowers, the general public and from state and federal regulators, either directly or as successors-in-interest for others of the Defendants. The concealment was completed, ratified and/or confirmed by each Defendant herein directly or as a successor-in-interest for another Defendant, and each Defendant performed the tortious acts set forth herein for its own

monetary gain and as a part of a common plan developed and carried out with the other Defendants, or as a successor-in-interest to a Defendant that did the foregoing.

12)    The true names and capacities of the Defendants listed herein as DOES 1 through 1,000 are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names.  Each of the DOE Defendants was the agent of each of the other Defendants herein, named or unnamed, and thereby participated in all of the wrongdoing set forth herein. On information and belief, each such Defendant is responsible for the acts, events and concealment set forth herein and is sued for that reason. Upon learning the true names and capacities of the DOE Defendants, Plaintiffs shall amend this Complaint accordingly.

## MISCONCEPTION THAT ONLY BORROWERS ARE AT FAULT

13)    Some may consider this matter as a simple issue of whether courts and laws should help "*irresponsible,*" gullible people who got way over their heads in debt and into expensive home purchases and mortgage loan transactions that they should never have considered when they "*knew*" or "*should have known*" that they could not afford such luxuries and extravagances. Thus, since they "*knew*" that they could not really afford what they got into, they need only blame themselves for what has happened to them. The issue may then be simply framed whether those directly involved in getting the Plaintiffs into impossible and implausible financial dilemmas that eventually lead to unaffordable situations and possible foreclosure of their homes, are entirely blameless and should be left alone to benefit from the "fruits of their fraud" without repercussions or accountings of any type. In the case of some homeowners, their foreclosures have already taken place.

## BASIC ISSUES BEING CHALLENGED BY THIS LAWSUIT

14)    This case, however, is not that simple. In fact, when viewed in the totality of the circumstances, this matter is not simply a case of innocent, hard working, honest, home purchasers and borrowers being duped and being taken advantage of by unscrupulous individuals and lending companies. This case deals with arrogant, irresponsible and greedy companies that made predatory, toxic and ultimately unaffordable loans to Borrowers, and preyed on gullible, unsophisticated consumers, and as such it is a class action challenging, among other things, the:

a)      Standing[1], at the outset, of any putative person or entity that claims to have the power to enforce through foreclosure, the default rights under the applicable mortgage promissory notes (and the deeds of trust) in a securitized mortgage, REMICS or Conduit Loan scheme in New York.

b)      Legality of so-called "Toxic ARM Loans" or "Adjustable Rate Mortgage";

c)      Legality of lenders' failure to disclose the *aggregate costs* involved in so called "Negative Amortization Loans";

d)      Legality of failure to disclose the *aggregate costs* of the transaction involved in so-called "Toxic ARM Loans" *and* any accompanying subordinate financing schemes to purchase or refinance a residential dwelling, which, *but for* the subordinate financing, the transaction as a whole would not have taken place. Simply put, if the only way you can afford to buy a house is with a second loan, then the costs of that loan should be included in the "costs" of the first loan so the buyer can make an informed decision.

e)      Legality of failure to completely account for the aggregate costs of a transaction which purports to *disclose* a "yield spread premium" ("YSP"), but yet entirely fails to include that YSP in the calculations applicable to the Truth in Lending Act Disclosures ("TILA Disclosures");

f)      Legality of failure to disclose the applicable "par value" of a loan transaction before the transaction is made or completed.

g)      Legality of the failure to properly account for, disclose, and calculate or list all the quantifiable reasons for the difference that exists between the YSP and the "par value" costs of a loan so as to properly and adequately inform borrowers the reasons or guidelines as to why they obtained an "above par value" pricing for their particular loan; especially if, as stated in the loan applications which are the subject of the present Second Amended Complaint, Plaintiff Darrick Grimes had impaired credit based upon prior predatory lending matters directed at African-

---

[1] The issue of "Standing" is a basic issue of Constitutional Law either at the Federal level or at the state district court level. That is to say, if you are not the person directly injured or directly benefiting from a specific law or circumstance, you cannot go to court and try to enforce any rights that do not belong to you. The United States Supreme Court in several cases has stated that federal courts must satisfy for themselves that Standing exists and that "the plaintiff has `alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." Warth v. Seldin, 422 U.S. 490, 498-99 (1975). Thus, if no direct injury or direct harm to the claimant that wishes to pursue a claim in court, then no right to "standing" or right to be in court in the first place.

Americans in the Queens County, New York.  In this case, as stated by the Jonathan Tanenbaum and WCS Lending in Plaintiff Yolanda Grimes "had *excellent credit* and was a good candidate for the loan application"; "Plaintiffs earned real and unadjusted incomes".

  h) Legality of whether a "pool" or "tranche" of securitized mortgage backed securities, whose associated pool has been paid by its "loss of value insurer," or various "credit enhancement policies" may still foreclose on homes belonging to that pool in a double payment, triple payment or even quadruple payment scheme. That is to say, if the investments have already been paid off or "bailed out" by their "securitized pool insurer or credit enhancement policy or guarantee" or "bail out federal government entity", are the putative investors still entitled to foreclose on consumers that have not been "bailed out." Further, if the investors have already been paid once, why do they continue to have the right to get paid out yet a second time if they already had required "loss reserves" insured against the possibility of default; and that is even before a foreclosure is completely processed? To add insult to injury and add profits for the nefarious actors in these schemes, a foreclosure essentially effectuates a potential payment of yet a third time on the same notes, pools, or tranches of securitized mortgage backed securities. And because of how the Internal Revenue Code is written (e.g. Internal Revenue Code of 1986 Sections 860D and 1031)2 and applied to these Conduit Loan activities, these profits are potentially tax free to the pool owners or investors, giving them yet a fourth source of profit distribution to the investors that purchase the securitized debt obligations in a securitized mortgages pool scheme. Considering the "bail out" payments and the totality of the circumstances, the Defendants' behavior is not just egregious, unconscionable, arrogant, irresponsible, and greedy; it is outright robbery and theft being perpetrated against innocent and unsuspecting victims: 1) the people who signed up for these loans and 2) the American taxpayer.

  i) Legality of whether a merely putative "holder or servicer of the Note" but not the direct "beneficiary of payments of the Note", has the standing to enforce any provisions of the Note, including the power to enforce the Note by foreclosure; especially when the original Promissory Note is lost. For example, within the housing market itself, just because you are a "holder/tenant" of a house, do you have the right to sell the house? More to the point, just

---

[2] In this Complaint, a qualified real estate mortgage investment conduit is defined in §§ 860A through 860G of the Internal Revenue Code of 1986 (the "IRS" Code"), as amended. The "Defeasance" of REMICs, if done properly and to minimize the tax effects inherent therein, is controlled by the like-kind exchange provisions of IRS Code § 1031.

because you are a Property Manager of a group of houses, responsible for collecting payments, paying insurance and taking care of maintenance fees and repairs, do you have the right to foreclose and or sell a house on behalf of the house owners you never met and you never contracted with?

      j)      One sided practical application of the 33 Act §1043 disclosures and SEC Rule 424(b)(5). Specifically, when applied to the mortgage securitization industry, the prospective pool issuer or sponsor of the REMIC pool or Conduit Loan must comply with the disclosure requirements of the 33 Act by filing a "424(b)(5)"[4] prospectus or private placement memorandum. That Rule 424 filing warns any prospective investors, before the prospective investor buys securitized mortgage certificates, that certain loans in the proposed securitized mortgages pool possessing Negative Amortization or interest only loan characteristics present a "…*likelihood of default, especially in the early years*…." Yet, in violation of the 33 Act §10 itself, potential borrowers are *never* warned or told that their loan type is likely to fail or likely to default regardless of the borrower's high credit score, intention, and valiant effort to pay the mortgage loan. This failure to "trickle down" and "enforce the warnings and disclosures" as against mortgage loan borrowers is in direct contravention of the 33 Act §10 itself which states:

      In the exercise of its powers …, the Commission shall have authority to …prescribe …

      the form and contents which it may find *appropriate* and *consistent* with the *public*

      *interest* and the protection of investors [emphasis added].

---

[3] Securities Act of 1933, § 10(d): Classification of prospectuses: "In the exercise of its powers under subsections (a), (b), or (c), the Commission shall have authority to classify prospectuses according to the nature and circumstances of their use or the nature of the security, issue, issuer, or otherwise, and, by rules and regulations and subject to such terms and conditions as it shall specify therein, to prescribe as to each class the form and contents which it may find *appropriate and consistent with the public interest* and the protection of investors [emphasis added]."

[4] Securities and Exchange Commission Rule 424(b)(5) requires that: "A form of prospectus that discloses information, facts or events covered … shall be filed with the Commission no later than the second business day following the earlier of the date of the determination of the offering price or the date it is first used after effectiveness in connection with a public offering or sales, or transmitted by a means reasonably calculated to result in filing with the Commission by that date."

Warning borrowers that their loans are likely to default because of the nature and characteristics of their loan itself is appropriate and consistent with the public interest.[5]

These failures of any putative interested party to have the legal standing to foreclose on defaulting mortgage promissory notes which are part of a mortgage securitization scheme; failures to make otherwise valid and non-negative amortization loans to finance home purchases or refinancings; failures to aggregate financing costs; failures to properly account for all the costs and finance charges associated with Toxic ARM loans; failures to account for and aggregate *ab initio* for the cost effects of subordinate financing in a given transaction; failures to adequately create, maintain, and monitor *any indicia* of quality and/or quality control for those individuals and entities originating loans so that loan applications would be accurately and truthfully completed; failures to properly disclose all other hidden costs in connection with the financing of a consumer transaction; failures to give timely Truth in Lending Disclosures or Good Faith Estimates; failures to make sure that bank statements would not be altered, falsified, or otherwise improperly completed or tampered with so as to show higher than existing savings and checking account balances at the time of loan application; failures to show the proper and chronological "chain of custody" of a Promissory Note in the securitized mortgage backed securities market so as to unquestionably give the right to the "holder" of the Note to enforce the Notes by foreclosure when the Notes default; failures to disclose to borrowers the risks inherent in

---

[5] This failure to require and enforce appropriate borrower disclosures at the time the securitized loan is made or applied for renders the SEC potentially culpable if not complicit in the predatory lending schemes which are the subject of this Complaint. Basically, what is good for the goose is good for the gander. These Toxic ARM loans actually create a galling and perplexing dichotomy in the respective prospectus filed with the SEC: always protect the investors and disclose all potential default risks in a certain securitized investment pool, but drown the borrowers themselves and never warn the borrowers; regardless of whether it is in the public interest to warn the borrowers of the default risks inherent in the loans themselves. The effects of these failures are being felt all over the country.

Toxic ARM loans; and failures to account for "bail out" fund payments, credit enhancement payments (e.g. securitized mortgage pool default insurer), loss reserve fund payments, and getting paid out perhaps no less than three (3) times on the same mortgage notes when a foreclosure is instituted against the Plaintiffs, are in direct violation of TILA, RESPA, HOEPA, RICO, the 33 ACT, federal and state Bank Fraud laws, and others. Additionally, this suit also raises issues of actual fraud and artifice designed and perpetrated by various parties acting in concert and preying upon unsuspecting consumers.

15)   These securitized mortgage pools were set up in a manner which allows them to function as racketeering activities in glorified pyramid and ponzi schemes operating under the color of law. Further, these deceiving, underhanded, and egregious activities generated (and continue to generate) payments that had the effect of artificially inflating the cost of the consumers' loans, and reap for the Defendants quite substantial, illegal, unconscionable, on-going, and improper profits at the expense of the Plaintiffs and other similarly situated class members. As we now know from the mortgage mess we are all experiencing, these illegal profits are ongoing. Most disconcerting, all these violations had the immediate and incurable effect of ruining innocent peoples' lives; ruining Plaintiffs' American dream of owning a home they could afford; ruining Plaintiffs' credit, credit histories, and credit scores; exhausting any family savings and retirement funds; and ruining all Plaintiffs' health given the enormous stress as Plaintiffs will likely be rendered homeless due to foreclosure of their homes at any given moment because of their inability to pay the mortgage loans that Defendants set up for them.

16)   To make a cruelly and sadly accurate analogy: this is not a simple case of leading lambs to the slaughter. Rather, it is a case of salivating carnivores dressed in lambs' clothing luring unwitting and docile lambs to the feeding trough with promises of finding delicacies, and then using them to feed their insatiable feeding frenzy. Like rapacious scavengers, they pick apart the body and soul of their innocent and unsuspecting victims. Even after the loans started "defaulting" these insatiable scavengers continue to feed on their victims' bodies and souls by securitizing, collateralizing, and re-selling these loans in "tranched investment pools", "securitized investment pools", "non-agency mortgage backed security pools", and other

"securitized debt derivatives" that get cross-defaulted and/or cross-swapped, insured, re-insured and ultimately paid-off (perhaps multiple times) before even reaching the unsuspecting taxpayers and guaranteed government bail-outs. Specific allegations regarding the Defendants' ponzi scheme and modus operandi are more fully set forth below.

## DROWNING IN THE POOL –SIMPLIFYING THE ISSUES OF A VERY COMPLICATED MESS

17)   We recognize that the issues outlined and challenged by this Second Amended Complaint are possibly very complicated. In an effort to simplify the issues, however, this Second Amended Complaint may possibly be better understood by following the example of the makers, sponsors and the owners of swimming pools that are benefiting from the pool fees and payments of life insurance policies obtained on their unsuspecting drowning victims.

18)   At the beginning, the swimming pool makers, sponsors, managers and owners advertise the opening of their brand new pools, one pool at a time; just like in typical ponzi or pyramid promotional scheme that attracts new innocent participants all the time.

19)   Only good or excellent swimmers need apply to become members of the pools; just like our Plaintiffs who had good and excellent credit at the time that their loans were originated. In fact, if you are not a good swimmer, you will not be accepted into the swimming pools.

20)   Naturally, the better the quality of swimmers in the pools, the better the perceived quality of the pool. Thus, the better the perceived credit quality of mortgage notes signers or borrowers, regardless of their ability to pay or swim in the pools, which leads to better quality securities for ultimate designation as good "commercial grade/investment grade paper" or real estate investment conduits ("REMICS").

21)   The higher the quality of swimmers, the higher the credit rating agencies like Standard & Poor's, Moody's or Fitch's designate the characteristics of a particular REMIC pool. For instance, a triple AAA rating in a given securitized mortgage pool implies that the investment is sound, is likely to get paid out, has virtually no risk of loss, and the potential investors can feel more comfortable investing their money in the designated securitized pool certificates

14

22) Once the first pool of "investment grade paper or negotiable instruments" is full, the entire pool gets sold on Wall Street's securities, secondary markets, or private placements as "good investments."

23) As soon as the first pool of "excellent credit borrowers" is full it is sold; then it is time to fill the next pool. The racketeering activity and ponzi scheme continues. Any pools already built but empty are just waiting to get filled by what is called "shelf registrations" with the Securities and Exchange Commission.

24) Once the second pool gets full, that pool gets sold as well, and so on; just like in typical ponzi or pyramid promotional scheme which attracts new innocent participants all the time.

25) This scheme of selling pools full of apparently good or excellent credit borrowers is nicely packaged by the pool sponsor or issuer or ponzi scheme creator. It creates the appearance that only good, responsible and strong swimmers belong in the pool and therefore only good quality pools are offered in the securities markets.

26) In fact, the better the credit score, the better the quality of the securitized pool. Thus, if you are not a good swimmer (Credit Scores of over 600), or better yet, an Olympic medal swimmer (Credit Scores of over 750), you could not swim or belong in the pools. Unbeknownst to all eligible swimmers put into these securitized mortgage pools, is that the pool makers, sponsors, participants, associates, co-conspirators and ponzi scheme creators know that these borrowers are likely to default on their particular loans especially in the early years, and that the pool conspirators and creators have made provisions for that dire eventuality.

27) However, in order to maximize profits for the pool builders, the pool sponsors, the pool managers, the pool servicers, and the pool owners (investors or purchasers of "certificates"), it is not disclosed by the conspirators, co-conspirators and ponzi scheme creators in the offerings to the potential swimmers that these swimming pools are specifically designed to drown all swimmers.

28) When the swimmers begin to drown the pools' insurance policies or credit enhancement provisions of the particular pools pay-out and the swimmers' homes are foreclosed. One of the beauties of this nefarious racketeering activity and ponzi scheme is because of the applicable REMIC provisions in the I.R.S. Code, all these eventual pay-outs are tax free.

29)   In reality, precisely because you were a good/excellent swimmer, you were put in the pool; in the pool of swimmers that would eventually drown no matter how strong or how much energy (money, savings, stocks) you had.

30)   Only a few lucky swimmers eventually survived if they managed to get out of the pool at the beginning of a pool's opening. They either managed to sell their house early or were able to refinance their loans before their credit scores were damaged.

31)   Also disconcerting is the fact that if the borrower is a good swimmer and survives the drowning pool, that is good for the borrowers but not good for the pool makers, servicers, pool owners, and ponzi scheme creators.

32)   Knowing that the borrowers are destined to drown because of their good credit, good credit scores and their relatively low income, the swimming pool sponsors, issuers, servicers, trustees, owners and ponzi scheme creators take out default/disaster insurance (for example through insurers like AIG or its affiliates) against the likelihood that most or all the swimmers will drown.

33)   Once the previously strong swimmers are drowning, or dead, or holding on to their last breath of life, the pool managers, sponsors, issuers, trustees, owners, and ponzi scheme creators make demand on the appropriate pool insurer to start paying on the insurance policies the pool owners purchased, and also demand that the loan loss reserve accounts be activated and pay out.

34)   Unfortunately for the drowning swimmers and their estates, at that point their houses are still in the drowning swimmer's name. Because the only way the pool managers, sponsors, owners and ponzi scheme creators can get title to the drowned swimmers' homes is through foreclosure of the victims' homes, the pool managers, sponsors, owners, and ponzi scheme creators start using the legal process to take the drowned victims' houses away and either put the houses in the pool owner's name (through foreclosure or deeds-in-lieu of foreclosure), or sell the houses to other swimmers in new pools of securitized mortgage loans.

35)   Thus, like an orchestra that has been perfectly choreographed and through the help of their aiding and abetting associates at foreclosure law firms, the pool managers, servicers, issuers, owners, or ponzi scheme creators start taking the houses away from the swimmers' estate one at a time to increase the pool owners' profits. Although foreclosing law firms and trustees

have a fiduciary duty6 to both a Lender and a Borrower to make sure that the foreclosing entity actually has the power or authority to commence foreclosure proceedings, these collaborating associates in the securitized mortgage pool or mortgage loan ponzi scheme environment rarely comply with and most times even ignore their fiduciary duty to the affected Borrowers. It is not helpful that their unchallenged participation in the foreclosure process provides these conspirators and aiders and abettors with hefty legal fee revenues and, at times, commissions of 5% or more of the sale price of a given foreclosed property. Since their activities are "presumptively valid" by statute in a non-judicial foreclosure jurisdiction like New York, these participating foreclosure law firms and foreclosing representative entities are hardly ever challenged or questioned in court.

36)   Before they all drown, the swimmers' survival instinct pushes them to want to come out of the pool.

37)   Unfortunately, by the time the chosen swimmers want to come out of the pool and realize that they must get out as quickly as possible, it is too late. The borrowers' once stellar and excellent credit and ability to swim in the pool is vastly diminished. In fact, the great credit and credit scores that got them in trouble to begin with have by now been destroyed and they cannot even attempt to refinance their homes. Under these unfortunate conditions, even feeding their families in order to keep swimming becomes a struggle.

38)   Unable to refinance their homes, the once strong but now failing swimmers wish for a life jacket or boat to help them get out of the pool. Family members are called in to help them by asking them to throw life lines. At times, even the occasional life line providers are forced into the pool of swimmers to help save the father, mother, sibling, or friend who is drowning in the pool and can no longer swim.

39)   Then the swimmers ask the pool makers, owners, operators, conspirators and ponzi scheme creators to help as well in order to survive and not drown in the pool. When help is given, which it rarely is, the life boat or life jacket in the form of a proposed loan modification or forbearance period may also be full of holes and, in most cases, only delays their inevitable drowning.

---

6 See Powell v. Adams 179 VA 170 (VA Sup Ct 1942)(Deed of Trust Trustee has a fiduciary obligation to all parties of the Deed of Trust; not just the Lender).

40)   Little do the drowning swimmers know that default is preferable to the pool makers, owners, operators, conspirators and ponzi scheme creators. Unfortunately for the drowning swimmers, each pool owner/conspirator/sponsor/ ponzi scheme creator may actually make more profit foreclosing on a lower valued property because then the pool owners can start filling up other new and attractive pools for any remaining good swimmers out there. In case of a loss on a residential mortgage pool, these creative scheming conspirators may even start selling tax credits on lower valued foreclosed properties to other interested investors that want to minimize their tax liabilities.

41)   Thus, since the process can start up again when houses begin getting foreclosed and re-sold, the pool owners and ponzi scheme creators have no real incentive to modify the situation at all.

42)   Sadly, it is plain to see that swimming pool owners, operators, conspirators and ponzi scheme creators servicing or owning pools that are full of drowning victims have no real incentive to fix the drowning pool situation because there is more profit in a foreclosed home loan than in a modified one.

43)   Viewed from this perspective, it is ironic that the people who could not swim at the beginning of the process, and who had bad credit or no credit at all when these shenanigans started taking place, are better off today than those excellent swimmers who started off with good credit and savings to join their respective securitized mortgage pool.

44)   Further, it is ironic that the bad credit or no credit people survived no worse off than before, but the good and excellent credit people did not survive at all.

45)   Steve Biko, one of South Africa's most significant political activists and considered a martyr of the anti-Apartheid struggle once said "...if you show people how to look at things differently, things change." Mr. Biko's perspective helped other people question the legality of apartheid, until that unquestioned "legal policy" was ultimately eliminated. Thus, if you observe the present securitized mortgage pools from afar and with a bird's eye view, is it right to blame the swimmers for drowning, or do you blame the pool makers, pool sponsors, pool managers, pool servicers, pool trustees, pool owners, conspirators and ponzi scheme creators for building the drowning pools in the first place.

46)   To put it more simply and to keep things in perspective, we need to borrow some case law that has developed from the product liability cases. For instance, just because a child plays

with a defective toy and loses an eye, the fact the toy maker did not know that the product was defective does not mean they are not liable for making a defective product. Similarly, just because car company executives do not know that their New Model car gas tank would explode on contact in a car accident, it does not mean they are not liable for the deaths of all affected and charred New Model drivers and passengers.

47)   If the pool makers, pool preparers, pool sponsors, pool managers, pool trustees, ponzi scheme creators and other interested pool entities knew or suspected that their swimmers had a likelihood, and even a high likelihood, that the pool members in a Negative Amortization securitized pool would drown, especially in the early years as disclosed in their own securitization prospectus filed with the SEC, those individuals and/or entities cannot claim to be faultless just because they were not present when the swimmers first joined the pool.

48)   Furthermore, these schemers and pool sponsors readily acknowledged in their filed prospectus that the potential losses in their negative amortization loans could be higher than the losses on loans that did not have negative amortization characteristics. As such, if the pool maker, sponsor, issuer, conspirator or ponzi scheme creator knew that the borrowers may drown, or had a greater likelihood of drowning in these pools, and in fact, intended that they would drown, they may not now shield themselves behind loan origination entities that may not even be longer around.

## JURISDICTION AND AVENUE

49)   This action arises under 15 U.S.C. § 1635, 12 C.F.R. § 226, 15 U.S.C. § 2601 and 2614, 12 C.F.R. § 3500, and under New York statutory and common law. This Court has jurisdiction over federal claims in this action based on 18 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983 which confer original jurisdiction on federal district courts in suits to address the deprivation of rights secured by federal law. This Court also has supplemental jurisdiction over pendant state law claims because the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution, pursuant to 28 U.S.C. § 1367.

50)   The unlawful conduct, illegal practices, and acts complained of alleged in this complaint were all committed in the Southern District of New York and the involved real

property is located in the Southern District of New York.  Therefore, venue properly lies in this District, pursuant to 12 U.S.C § 2614 and 28 U.S.C. § 139(b).

51)   This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiffs' state law claims, including but not limited to determination of status as holder in due course under New York Real Property Actions and Proceeding Law, and on the one hand, and equitable action for quiet title in Southern District of New York Court pursuant to New York State laws.

52)   These state law claims constitute the foundation, in turn, for Plaintiffs federal claims in that all arise out of a common nucleus of related facts and form part of the same case or controversy under Article III of the United States Constitution. The execution, handling, and crediting of these negotiable instruments is inextricably intertwined with questions of payment and consumer credit and hence, all questions of legal and equitable claims to right, tile, and interest in the property, subject of this lawsuit and equitable action.

53)   This Court has jurisdiction over the mortgage and note issues raised herein by Plaintiffs under the federal Fair Debt Collections Act ("FDCA"), 15 U.S.C. § 1601 et seq. ("TILA"); Regulation Z, 12 C.F.R. § 226 et seq.; the Civil Rights Act and above all RESPA, 12 U.S.C. §§2601 et seq.

54)   This Court accordingly has Federal question jurisdiction pursuant to 28 U.S.C. §1331 over Plaintiffs action for declaratory relief pursuant to 28 U.S.C. §§ 2201-2202 and Rule 57 of the Federal Rules of Civil Procedure. To effectuate the declaratory judgments herein requested, injunctive relief is authorized by 28 U.S.C. §2202 and Rule 65 of the Federal Rules of Civil Procedure.

## FACTUAL ALLEGATIONS

55)   The ownership of a home is a fundamental bridge to financial security that has become an indispensable part of the "American Dream."  It is the bedrock of economic security, as well as the primary vehicle by which families build wealth. Home equity accounts for more than one-third of the average net wealth of U.S. households.   The percentages are even greater for minorities.   A recent Pew Hispanic Center study found that among African-American homeowners, the median family held 88%of its total wealth in the form of home equity.

56)   During the last decade, African-Americans have joined Hispanic borrowers in helping to fuel a multiyear housing boom, accounting for 49% of the increase in home ownership from

1995 to 2005, according to Harvard's Joint Center for Housing Studies. Nonetheless, African-Americans are far more likely to have their American dream unduly burdened with sub-prime loans than their Caucasian counterparts.

57)   Sub-prime loans are higher-cost mortgage products that are theoretically given to borrowers who have impaired credit. During the past 10 years, an entire "sub-prime" industry has been spawned by larger "profits" generated by the higher rates and exorbitant fees charged to "high risk" borrowers.

58)   Unfortunately, the "sub-prime" industry has also attempted to maximize its profits by directing borrowers with relatively good credit to "sub-prime" mortgages. These predatory tactics have been disproportionately applied against members of the African-American community.

59)   The majority of African-Americans who took out purchase mortgages in 2005 were put into higher-cost sub-prime loans, compared with about 17% of Caucasians, according to Federal Reserve data. As just two examples, the South Side of Chicago, with a large concentration of minority borrowers, has a high concentration of sub-prime loans and the state's highest foreclosure rate. And in Boston, where defaults are rising primarily in minority neighborhoods, 73% of high-income African-Americans (those making $92,000 to $152,000) received sub-prime loans in 2005, compared with 17% of Caucasians.

60)   This is consistent with the Association of Community Organizations for Reform Now (ACORN) finding in 2001 that among upper-income African-Americans nationally, 18.05 percent of conventional refinance loans received were from sub-prime lenders, whereas for upper-income Caucasian homeowners it was only 4.81 percent. In fact, upper-income African-American homeowners are more likely to receive a sub-prime loan while refinancing even when compared to lower-income Caucasian homeowners.

61)   While some borrowers in the sub-prime market are genuine credit risks, African-American borrowers have been targeted and illegally steered into sub-prime loans. Defendants are reluctant or refuse to offer these borrowers the prime loans that are offered to Caucasian borrowers with the same qualifications. Instead, Defendants engage in predatory sub-prime lending, knowingly make loans with high loan-to-value ratios, in this case to borrowers who qualify for lower-cost or prime loans, in what amounts to a kind of "reverse redlining". Studies by Freddie Mac and Standard & Poor's have found that 20% to 30% of borrowers who receive

sub-prime mortgages could have qualified for traditional mortgages at the lower rates offered by banks to prime borrowers. This effectively dilutes the equity from the property, places the borrower in jeopardy of default, and puts the borrower in the position of spending years paying off additional loan balances without developing any equity.

62) Earlier this year, over 80 consumer groups wrote to Federal Banking Agencies about a particular type of sub-prime loan, the adjustable rate mortgage (ARM). An ARM typically contains an average built-in "shock payment" increase of 29%, even if interest rates remain unchanged. Fitch Ratings reports that the actual payment shock may be as high as 48%. The majority of sub-prime loans made to African-Americans had these adjustable rates, called 2-28 or 3-27 ARMs. The Center for Responsible Lending estimates that 2.2 million such sub-prime loans have ended or will end in foreclosure, a rate of 19%.

63) In September 2005, the Federal Reserve Board concluded that African-Americans were more likely to pay higher prices for these mortgages. The United States Inspector General then cited that report as showing "significant" differences that made it "clear" that African-Americans were "much more likely to get higher-priced loans" than Caucasians, and the FDIC has stated that it does not believe that these significant disparities can be explained away by risk-based pricing, as the lending industry has repeatedly tried to do.

64) Further, the U.S. Department of Housing and Urban Development found that in neighborhoods where at least 80 percent of the population is African-American, borrowers were 2.2 times as likely as borrowers in the nation as a whole to refinance with a sub-prime lender. In fact, upper-income borrowers living in predominately African-American neighborhoods are twice as likely as lower-income Caucasian borrowers to have sub-prime loans. Accordingly, the Secretary of Housing and Urban Development, Alphonso Jackson, was recently quoted as stating he believes African-Americans have been specifically targeted by sub-prime lenders.

65) While long suspected, this discrimination has only recently been disclosed and quantified. It has only been in the last few years that mortgage lenders have been required to submit details of their sub-prime home loans under the Home Mortgage Disclosure Act. The non-profit Center for Responsible Lending performed a study using this data and a custom software program to analyze over 177,000 individual loans, culminating in May 31, 2006 report entitled "Unfair Lending: The Effect of Race reporting data form the lenders themselves under

that Act, with a proprietary loan-level database that was able to account for and exclude specific risk profiles. Even after accounting for risks, clear disparities remained:

66)   On fixed-rate loans, African-Americans are 31% to 34% more likely to receive a higher-rate loan than if they had been Caucasian. Those numbers were even higher for loans containing prepayment penalties, which accounted for over 60% of the loans issued to African-American mortgagees.

67)   On adjustable-rate loans, African-Americans are up to 15% more likely to receive a higher-rate loan than if they had been Caucasian.

68)   These disparities can only be explained by race. Placing African-American mortgagees into higher-priced sub-prime loans based on their race violates the New York State Executive Laws, Human Rights §296(a) and the Civil Rights Act. The violations entitle the Plaintiffs to relief provided under the Civil Rights Act, specifically declaratory and injunctive relief. This relief could include, but is not limited to, ordering Defendants to cease and desist from the unlawful conduct described above, and to modify their lending practices to conform to statutory requirements; the establishment and publication of informative materials and programs; and this Court retaining jurisdiction on an ongoing basis in order to ensure and, where necessary, enforce its judgment.

## INTRODUCTION AND BACKGROUND
## OF THE MASTER SCHEME OF DECEPTION AND FRAUD

69)   This lawsuit arises from: (1) Defendants' deception in inducing African-American borrowers and the Plaintiffs to enter into subprime mortgages from 2003 through 2007 with the Fremont Defendants (defined below in Paragraph 8); (2) Defendants' breach of Plaintiffs' Constitutionally and statutorily protected rights and violated the inalienable Constitutional rights accorded to all New York citizens of privacy; and (3) Defendants continuing tortious conduct intended to deprive Plaintiffs of their rights and remedies for the foregoing acts, described below.

70)   This action seeks remedies for the foregoing improper activities, including a massive fraud perpetrated upon Plaintiffs and other borrowers by the Fremont Defendants that devastated the values of their residences, in most cases resulting in Plaintiffs loss of all or substantially all of their net worth.

71)   Defendant Fremont Investment and Loan ("Fremont") was among the leading providers of subprime mortgages in New York during all times relevant to this Second Amended

Complaint. By 2005, Defendant Fremont was the sixth largest U.S. subprime mortgage lender in the United States, originating over $59.5 billion in mortgage loans in 2005, over $61.0 billion in 2006, and over $40.8 billion in 2007.

72) The fraud perpetrated by the Fremont from 2003 through 2007, including by Fremont starting no later than 2007, was willful and pervasive. It begin with simple greed and then accelerated when Fremont's senior management led by CEO Louis J. Rampino ("Rampino ) discovered that Fremont could not sustain its business, unless it used its size and large market share in New York to systematically create false and inflated property appraisals throughout New York. Fremont then used these false property valuations to induce Plaintiffs and other borrowers into ever-larger loans on increasingly risky terms. As Fremont knew from no later than 2004, these loans were unsustainable for Fremont and the borrowers and to a certainty would result in a crash that would destroy the equity invested by Plaintiffs and other Fremont borrowers.

73) Hand-in-hand with its fraudulently-obtained mortgages, senior management and others at Fremont hatched a plan to "pool" the foregoing mortgages and sell the pools for inflated value. Rapidly, these two intertwined schemes grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values – county-by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage-providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagees on an unprecedented scale.

74) From as early as 2003, Fremont's senior executive officers led by Rampino knew the scheme would cause a liquidity crisis that would devastate Plaintiffs' home values and net worth's. But, they did not care, because their plan was based on insider trading – pumping for as long as they could and then dumping before the truth came out and Plaintiffs' losses were locked in.

75) At the very least, at the time of entering into the notes and deeds of trust referenced herein with respect to each Plaintiff, Fremont, each Defendant originating a mortgage, each Defendant in the chain of title of the foregoing mortgages and each Defendant servicing the foregoing mortgages and the successors to each of the foregoing (collectively, the "Fremont Defendants") was bound and obligated to fully and accurately disclose to each borrower,

including each Plaintiff herein, that the mortgage being offered to the Plaintiffs were, in fact, part of a massive fraud scheme that Fremont knew would result in the loss of the equity invested by Plaintiffs in their home and in severe impairment to Plaintiffs' credit rating.

76)   It is now all too clear that this was the ultimate high-stakes fraudulent investment scheme of the last decade. Couched in banking and securities jargon, the deceptive gamble with consumers' primary assets – their homes – was nothing more than a financial fraud perpetrated by Defendants and others on a scale never before seen. This scheme led directly to a mortgage meltdown in New York that was substantially worse than any economic problems facing the rest of the United States. From 2004 to the present, New Yorkers' home values decreased by considerably more than most other areas in the United States as a direct and proximate result of the Defendants scheme set forth herein. Fremont's  business model premise was to leave the borrowers, including Plaintiffs, holding the bag once Fremont and its executives had cashed in reaping huge salaries and bonuses and selling Fremont shares based on their inside information, while investors were still buying the increasingly overpriced mortgage pools and before the inevitable dénouement. This massive fraudulent scheme was a disaster both foreseen by Fremont and waiting to happen. Defendants knew it, and yet Defendants still induced the Plaintiffs into their predatory lending scheme without telling them.

77)   As a result, Plaintiffs lost their equity in their homes, their credit ratings and histories were damaged or destroyed, and Plaintiffs incurred material other costs and expenses, described herein. At the same time, Defendants took from Plaintiffs and other borrowers billions of dollars in interest payments and fees and generated billions of dollars in profits by selling their loans at inflated values.

78)   Like a drug that requires ever-higher doses to yield the same high, the fraud reached its zenith – or its nadir – when Fremont systematically destroyed New York home values county-by-county and then State-wide in African American neighborhoods.

79)   When Defendant Fremont pooled the loans it originated and sold them in secondary mortgage market transactions, Defendant Fremont recorded gains on the sales. In 2005, Defendant Fremont reported $451.6 million in pre-tax earnings from capital market sales; in 2006, it recognized $553.5 million in pre-tax earnings from that activity. But, after the liquidity crisis hit, in 2007 it recognized a mere $14.9 million in pre-tax earnings from that activity and reported an overall pre-tax loss.

80)   The Defendants include some of our leading financial institutions – institutions on which Plaintiffs thought they could rely, and did rely. But, they were wrong. As is clear from the mounting number of federal and state enforcement actions against Defendants, it is now widely recognized that they engaged in reprehensible conduct with regard to their mortgage lending business. Without limitation, the United States Securities and Exchange Commission ("SEC") should charged Fremont and other former senior executive officers of Fremont with fraud for the securitization counterpart of the fraud perpetrated on Plaintiffs and investors; the United States Federal Trade Commission ("FTC") should also initiated an investigation regarding Fremont mortgage servicing activities that borrowers were obligated to pay based upon the charges that they collected excessive fees from cash-strapped borrowers who were struggling to keep their homes; and the New York State Attorney General Office should commenced fraud proceedings against the recently departed Senior Management.

81)   These acts were committed through the entire Subprime Crisis Period and continue to this day with hardball tactics and deception that continue to threaten Plaintiffs' Constitutional rights and financial security, as well as the economic future of the United States of American and the State of New York.

## NATURE OF THE ACTION

82)   Plaintiffs specifically seeks a declaratory judgment that (1) neither U.S. Bank, N.A., as Trustee for MASTR Asset Backed Securities Trust 2006 FRE-1 are holders in due course of Plaintiffs note, (2) neither U.S. Bank, N.A., as Trustee for MASTR Asset Backed Securities Trust 2006 FRE-1  are in continuing privity of contract with Plaintiffs, because (3) Fremont Investment and Investment endorsed Plaintiffs Note without recourse (i.e. "cashed" this negotiable instrument, or in the alternative "transferred Plaintiffs note to an unknown third party for value paid and received"), and (4) if there is any residual amount owing to the true holder in due course on Plaintiffs' note, it is owed not by Plaintiffs but by Fremont and WCS Lending as condition precedent and essential term of both the fraudulent mortgage contract and the contract for title insurance agreed, made, and signed on or about October 12, 2005.

83)   Plaintiffs seeks final prohibitory injunctions to enjoin Defendant U.S. Bank, N.A., as Trustee for MASTR Asset Backed Securities Trust 2006 FRE-1  (and their successors and assigns) from further debt collection activities unless and until they can and have proved their legal and equitable status as holder-in-due course of the Plaintiffs Note, and Plaintiffs further

seeks a final mandatory injunction against U.S. Bank to compel them to pay all outstanding amounts due and owing since February 1, 2006 under the Note and Mortgage security agreement, if any, but no TRO is requested at the present time.

84)   Plaintiffs accordingly asserts causes of action against Defendant U.S. BANK, N.A. AS TRUSTEE FOR MASTR ASSET BACKED SECURITIES TRUST 2006 FRE-1, or FREMONT INVESTMENT AND LOAN, predicated on, inter alia, apparent violations of and justifying relief pursuant to the federal Fair Debt Collections Act ("FDCA"); but Plaintiffs seeks damages for breach of fiduciary duty and breach of contract only against WCS Lending, LLC, their assignees and guarantors, which for the time is only included as one potential "John Doe" Defendant).

85)   One problem appears to be that facially excellent and protective New York Statutes are being administered in the New York State Courts in such a way that the common law rights to limit collection and enforcement to "holders in due course" and other privileges inherent in the common law doctrine of "privity of contract" have been all but obliterated; again, the New York State Courts have repeatedly slammed the door in the face of these pretending Plaintiffs MBS Trust attempts to raise any Federal issues in that Court.

86)   These principal (traditional common law and statutory) elements of contract law (privity of contract required to enforce obligation and "holder in due course") have always been a key requirement of the common law of contracts, and this requirement has been expressly upheld by New York State Courts in the past because it is enshrined, among other places, in New York State Laws.

87)   The effective abandonment of the common law by the executive and judicial branches did not come about as the result of overt democratically enacted legislative modification of the law, nor pursuant to any official governmental policy of or for the public benefit, but to enable and enrich a favored group which has profited from a non-governmental financial innovation of the late 1970s-80s known as "securitization of debt", with securitized and bundled "debt" sold on the open market in complete disregard and, in fact, in flagrant violation of all common law (and Uniform Commercial Code) principles of "holder in due course" or "privity of contract".

88)   "Holder in due course" and "privity of contract" were key elements of common law jurisprudence specifically protected from interference by the state governments under Article I, § 10, Cl. 1 of the United States Constitution, except where necessary to protect or advance a

compelling governmental interest in the state's interest of self-protection or emergency exercise of the police power. Cf., e.g., Allied Structural Steel Co. v. Spannaus, Attorney General Of Minnesota, et al., 438 U.S. 234; 98 S. Ct. 2716; 57 L. Ed. 2d 727 (1978).

89)   On or about December 26, 2006, U.S. Bank, as trustee through its agents, employees or servants, and Rosicki, Rosicki & Associates, P.C. alleged that they commenced a foreclosure action on the property owned by the Plaintiffs.

90)   The verified complaint alleges that U.S. Bank, N.A. as Trustee for MASTR Asset Backed Securities 2006-FRE-1 is "Plaintiff" and is the owner and holder of a Promissory Note, executed by Darrick Grimes and Yolanda P. Grimes as "Defendants".   This was not a true statement, because at the time the Complaint against the Plaintiffs was filed, U.S. Bank had neither received nor recorded a proper assignment of the mortgage and note, nor did it have authority to engage in Trust business in New York, including acting as trustee to file lawsuits to collect on the notes and foreclose on the mortgages. As of September 29, 2011, Defendant U.S. Bank had neither received nor recorded an assignment of the Note or Mortgage with the Court.

91)   The Verified Complaint filed against the Plaintiffs alleged that U.S. Bank "is entitled to judgment for the following amount: principal in the sum of $421,172.91 consisting of principal balance of $402,967.36 plus interest of $15,099.04, escrow/impound shortages or credits of $1,583.64, late charges of $267.87; Broker's Price Opinion, inspection and miscellaneous charges of $160.00; attorney fee $600.00 and title search $495.00, plus interest on the outstanding principal balance at the rate being 8.450 percent per annum, or such other adjusted rate as provided for in said agreement, from August 1, 2006 and all other expenditures recoverable under the Note and Mortgage and/or New York law."

92)   Since that time, these defendants together have pursued and received an order staying the Plaintiffs' from their home while representing to the Court that their actions were lawful and that U.S. Bank as trustee had the present right, ownership and authority to pursue both foreclosure and eviction.

93)   As will be further shown, U.S. Bank as trustee, and Rosicki Rosicki & Associates, P.C. conspired together to wrongfully foreclose on the Plaintiffs' home and to eject them from the home.

94)   The Defendant U.S. Bank contend and have represented to this Court that U.S. Bank as trustee "as trustee" is the holder of said mortgage and therefore has legal authority to foreclosed

on Plaintiffs' property in accordance with New York Real Property law and their rights under the security agreement.

95)   Of particular interest to the finder of fact is that there is no recorded Assignment of Mortgage on file in Orange County, New York, nor was any document identified in to Foreclosure Complaint identify Plaintiffs' mortgage loan is the property of U.S. Bank National Association as trustee, but which identifies this property as "U.S. Bank National Association as Trustee MASTR Asset Backed Securities Trust 2006 FRE-1, Mortgage Pass Through Certificates Series 2006-FRE1".

96)   When "MASTR Asset Backed Securities Trust 2006 FRE-1, Mortgage Pass Through Certificates Series 2006-FRE1" is searched on the SEC database known as the EDGAR database which makes public all filings required by the SEC a party finds certain legal filings required by the SEC to establish a publicly traded "special investment vehicle" or SIV in industry parlance which provide the following information:

> a)   That Mortgage Asset Securitization Transactions, Inc. is the depositor for a trust called the Asset Backed Securities Trust 2006 FRE-1, Mortgage Pass Through Certificates Series 2006-FRE1".

> b)   That the issuing entity offering Mortgage backed securities is Asset Backed Securities Trust 2006 FRE-1, Mortgage Pass Through Certificates Series 2006-FRE1" and it is a common law trust formed under the laws of New York.

> c)   That the trustee is U.S. Bank National Association.

> d)   That the primary servicer is Wells Fargo Bank, N.A.

> e)   That Fremont Investment and Loan is the originator of the mortgages that fund the trust.

> f)   That the certificates represent ownership interests in a trust fund, the assets of which will consist primarily of conventional, adjustable and fixed rate,

fully amortizing and balloon, first and second lien, residential mortgage loans having a total principal balance as of the cut-off date, which is February 1, 2006, of approximately $1,724,787,930. In addition, the supplemental interest trust will hold an interest rate swap agreement for the benefit of the certificateholders.

g) That on the closing date, which is expected to be on or about February 24, 2006, the assets of the trust fund will consist primarily of two mortgage pools of conventional, adjustable and fixed rate, fully amortizing and balloon, first and second lien, residential mortgage loans with a total principal balance as of balance as of the cut-off date of approximately $472,900,000.

h) That violation of various federal, state and local laws may result in losses on the mortgage loans ….Violations of certain federal, state or local laws and regulations relating to the protection of consumers, unfair and deceptive practices and debt collection practices may limit the ability of the servicer to collect all or part of the principal of or interest on the mortgage loans and, in addition, could subject the trust fund to damages and administrative enforcement.

i) The following additional information is also found:

The Mortgage Loans will be assigned by the Depositor to the Trustee, together with all principal and interest received with respect to such Mortgage Loans on and after the Cut-off Date (other than Scheduled Payments due on that date). The Trustee will, concurrently with such assignment, authenticate and deliver the Certificates. Each Mortgage Loan will be identified in a schedule appearing as an exhibit to the Trust Agreement which will specify with respect to each Mortgage Loan, among other things, the original principal balance and the Scheduled Principal

Balance as of the close of business on the Cut-off Date, the Mortgage Rate, the Scheduled Payment, the maturity date, the Servicer and the Custodian of the mortgage file, whether the Mortgage Loan is covered by a Radian Policy and the applicable Prepayment Premium provisions, if any.

Wells Fargo Bank National Association will act as Custodian on behalf of the Trustee, pursuant to the Custodial Agreement. As to each Mortgage Loan, the following documents are generally required to be delivered to the Custodian on behalf of the Trustee in accordance with the Trust Agreement: (1) the related original mortgage note endorsed without recourse to the Trustee or in blank, (2) the original mortgage with evidence of recording indicated thereon (or, if such original recorded mortgage has not yet been returned by the recording office, a copy thereof certified to be a true and complete copy of such mortgage sent for recording).

j)   Further the issuing entity can only act as set forth in the trust documents:

The Issuing Entity will not have any employees, officers or directors. The Trustee, the Depositor, the Master Servicer, the Servicer, the Credit Risk Manager and the Custodian will act on behalf of the Issuing Entity, and may only perform those actions on behalf of the Issuing Entity that are specified in the Trust Agreement, the Sale and Assignment Agreement, the Servicing Agreement and the Custodial Agreement. See *"The Master Servicer," "The Servicer," "Mortgage Loan Servicing"* and *"The Trust Agreement. "*The Trustee, on behalf of the Issuing Entity, is only permitted to take such actions as are specifically provided in the Trust Agreement. Under the Trust Agreement, the Trustee on behalf of the Issuing Entity will not have the power to issue additional certificates representing interests in the Trust Agreement, borrow money on behalf of the Trust

31

Fund or make loans from the assets of the Trust Fund to any person or entity, without the amendment of the Trust Agreement by Certificateholders and the other parties thereto as described under "-- *Certain Matters Under the Trust Agreement--Amendment of the TrustAgreement*"

k) The depositor represented to the trust that immediately prior to the transfer and assignment of the Mortgage Loans to the Trustee, the Depositor was the sole owner of record and holder of each Mortgage Loan, and the Depositor had good and marketable title thereto, and had full right to transfer and sell each Mortgage Loan to the Trustee free and clear... section 2.03(a)(vi).

l) Concurrently with the execution and delivery of this Agreement, the Depositor does hereby transfer, assign, set over, deposit with and otherwise convey to the Trustee, without recourse, subject to Sections 2.02, 2.04, 2.05 and 2.06, in trust, all the right, title and interest of the Depositor in and to the Mortgage Loans. Such conveyance includes, without limitation, the right to all payments of principal and interest received on or with respect to the Mortgage Loans on and after the Cut-off Date. Section 2.01(a)

m) According to Section 2.01 the depositor is required to provide in connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with, or cause to be delivered to and deposited with, the Trustee, and/or the Custodian acting on the Trustee's behalf, the following documents or instruments with respect to each Mortgage Loan (each a "Mortgage File") so transferred and assigned: with respect to each Mortgage Loan, the original Mortgage Note endorsed without recourse in proper form to the order of the Trustee, or in blank (in each case, with all necessary intervening endorsements, as applicable) or with respect to any

lost Mortgage Note, a lost note affidavit stating that the original Mortgage Note was lost, misplaced or destroyed, together with a copy of the related Mortgage Note; with respect to each Non-MERS Mortgage Loan other than a Cooperative Loan, an original Assignment of Mortgage, in form and substance acceptable for recording. The Mortgage shall be assigned either (A) in blank, without recourse or (B) to "U.S. Bank National Association, as Trustee of the MASTR Asset Backed Securities Trust 2006 FRE-1," without recourse; and (vi)if applicable, such original intervening assignments of the Mortgage, notice of transfer or equivalent instrument (each, an "Intervening Assignment"), as may be necessary to show a complete chain of assignment from the originator, or, in the case of an Intervening Assignment that has been lost, a written Opinion of Counsel acceptable to the Trustee and any NIMS Insurer that such original Intervening Assignment is not required to enforce the Trustee's interest in the Mortgage Loan; further under 2.03(c) (i) Assignments of Mortgage with respect to each Non-MERS Mortgage Loan other than a Cooperative Loan shall be recorded; provided, however, that such Assignments need not be recorded if, on or prior to the Closing Date, the Depositor delivers, at its own expense, an Opinion of Counsel addressed to the Trustee (which must be Independent counsel) acceptable to the Trustee and the Rating Agencies, to the effect that recording in such states is not required to protect the Trustee's interest in the related Non-MERS Mortgage Loans; provided, further, that notwithstanding the delivery of any Opinion of Counsel, the Master Servicer shall cause the Servicer to submit each Assignment of Mortgage for recording upon the occurrence of a bankruptcy, insolvency or foreclosure relating to the Mortgagor under the related Mortgage. Subject to the preceding sentence, as soon as practicable after the Closing Date (but in no event more than three months thereafter except to the extent delays are caused by the applicable recording office), the Master Servicer, at the expense of the Depositor and with the cooperation of the Servicer, shall cause to be properly recorded by the

Servicer in each public recording office where the related Mortgages are recorded each Assignment of Mortgage referred to in subsection (b)(v) above with respect to each Non-MERS Mortgage Loan.

97)   The documents of record in this case tend to show that the mortgage that is the subject of this litigation (which includes the missing assignments of record) do not convey the subject mortgage to the subject trust which seeks to foreclose on the Plaintiffs' home.

98)   In fact, the documents of record indicate that there is no assignment of record indicating that U.S. Bank National Association as trustee.

99)   These purported assignment tends to convey each of the following irregularities rendering the assignments invalid and legally unenforceable:

    a.   The documents are each signed by the same individual.

    b.   That individual purports to represent two different companies at the same time and place although those companies are separated by thousands of geographical miles.

    c.   The documents purport to act with corporate authority but lack the requisite corporate formalities to render them effective.

    d.   The documents purport to ultimately convey the mortgage to U.S. Bank National Association. However, the documents U.S. Bank's law firm from Rosicki Rosicki & Associates, P.C. tend to show the name of a specific trust which claims to own the mortgages.

    e.   The documents both contain an MSP file number identical to the one on the attached Rosicki Rosicki & Associates letter to the Plaintiffs.

    f.   If these documents were prepared concurrently with the date they claim to be executed they would have been executed prior to the generation of an MSP file number, providing an inference that these documents were fabricated to support the foreclosure of the defendant U.S. Bank's attorneys, Rosicki Rosicki & Associates.

g.  According to the documents created the trust which the defendants contend owns the Plaintiffs' mortgage, the only entity that could convey a mortgage to the trust was Mortgage Asset Securitization Transactions, Inc.

h.  Therefore, the assignments of record which purport to assign directly to U.S. Bank National Association as trustee fail to convey the mortgage to the trust which the defendants claim owns the mortgage since the assignors could not go outside the trust documents to convey mortgages directly to the trust nor could the trust go outside of its documents to accept a conveyance that did not comply with the trust agreement's terms.

i.  Also, even though these documents were recorded in 2006, and possibly fabricated. They fail to follow the basic steps for conveyance to the trust in that they are endorsed with recourse instead of without recourse and there is no assignment to the depositor "Mortgage Asset Securitization Transactions, Inc."

100) Further, should these defendants be willing to creep even further out onto the proverbial limb and argue that U.S. Bank National Association as trustee is the owner of said loan, the Plaintiffs' would posit only one question: As trustee for whom is U.S. Bank the owner of said loan?

101)  As the finder of fact may have now guessed, if the finder of fact is not bored to tears by now, a trustee cannot go beyond his powers set forth in the trust which grants him his powers.

102) U.S. Bank National Association "as trustee" has no power to act beyond the power granted in its trust agreement. If U.S. Bank intends to claim that it is not attempting to foreclose for "MASTR Asset Backed Securities Trust 2006 FRE-1, Mortgage Pass Through Certificates Series 2006-FRE1" then the court should either require U.S. Bank and Rosicki, Rosicki & Associates, P.C. to set forth in specific terms who it claims owns the mortgage in question and who U.S. Bank is serving as trustee for so that the Plaintiffs may have the benefit of reviewing

U.S. Bank's responsibilities and obligations under any alternative trust that it would like to claim owns the Plaintiffs' mortgage or equitably estoppel these defendants from so claiming based on their prior representations to this Court over nearly a year of litigation.

103) Further, the potential owners are quite numerous should these defendants go out on that proverbial limb even further (and should this Court allow them to do so) as even a cursory glance of SEC filings shows that there are currently no less than 32 active trusts for mortgage backed securities for which U.S. Bank serves as trustee.

104) The Plaintiffs contend that said sale was wrongful, illegal, in violation of law and the documents governing the relationship between the Plaintiffs and the owners of the Plaintiffs mortgage.

105) The Plaintiffs contend that the foreclosing entity lacked standing to initiate a foreclosure and that the foreclosure is void or at least voidable and that no title has passed to U.S. Bank National Association as there was no legal title to pass to it from the foreclosing entity.

106) The Plaintiffs allege that the actions of U.S. Bank's attorneys, Rosicki, Rosicki & Associates, P.C. and their agents, employees and servants were wrongful and tortious.

107) The Plaintiffs allege that the actions of the foreclosing entity were wrongful and tortious.

108) The Plaintiffs allege that the actions of Rosicki, Rosicki & Associates, P.C. and Defendant U.S. Bank National Association in attempting to eject them from their home and wrongfully foreclosing is a violation of law, wrongful and tortious and that U.S. Bank National Association holds no title to their home or property, and that its actions constitute trespass, negligence, wantonness, abuse of process and slander of title.

109) The Plaintiffs allege that the actions of U.S. Bank coupled with the actions of Rosicki, Rosicki & Associates, P.C. and their employees, agents and servants were a civil conspiracy to deprive the Plaintiffs of their property. Additionally, U.S. Bank and Rosicki, Rosicki & Associates, P.C. are in a joint venture wherein these parties were engaged in a civil conspiracy to falsify legal documents for the purpose of foreclosing on the homes of individuals under a colorable title of right for the purpose of generating profits and income from the act of depriving individuals of their homes and for the purpose of unjustly enriching the participants of the joint venture at the expense of the unsuspecting and unknowing.

110) The Plaintiffs allege that U.S. Bank National Association had the right to choose and control the attorneys who it hired to foreclose on loans and by having such control are liable for the wrongful and tortious conduct of their agents, employees and servants.

111) As a direct result of the acts complained of the Plaintiffs have been caused to suffer great mental anguish, economic and emotional damages and claim from the defendants all damages allowable under the law.

112) U.S. Bank National Association ("U.S. Bank") is an indirect wholly-owned subsidiary of U.S. Bancorp. U.S. Bank is engaged in a general commercial banking business, offering a full range of commercial, corporate, international, financial and retail banking services to corporations, governments and individuals.

113) U.S. Bank National Association is subject to regulation, supervision and examination by the Office of the Comptroller of the Currency.   U.S. Bank as Trustee is the alleged represented lender, and servicer under a purported Mortgage loan dated October 12, 2005 and filed on 12/06/2005  in the Orange County, New York County Records.

114) U.S. Bank, as Trustee [MASTR Asset Backed Securities Trust 2006 FRE-1, under the pooling and servicing agreement dated 2-1-2006], is a New York Trust.

115) After February 1, 2006, U.S. Bank, as Trustee [MASTR Asset Backed Securities Trust 2006 FRE-1, Mortgage Pass Through Certificates, Series 2006-FRE-1, under the Pooling and Servicing Agreement dated 2-1-2006] should have recorded an Assignment of Mortgage in the county where the property is located with the County's Clerk Office of Records..

116) No Assignment of Mortgage record exists for Plaintiffs' Mortgage by the cut off date of February 1, 2006 into any MASTR Asset Backed Securities Trust 2006 FRE-1. Nor did any exist prior to the filing of a 2006 "Foreclosure Complaint" done purposely for papering record mistakes for a Judicial Foreclosure Supreme Court New York, Orange County file in New York.

117) This maneuver was done with the sole purpose to wrongfully foreclose on the "Property" and was apparently signed, attested and confirmed by Defendant U.S. Bank's law firm on December 26, 2006 when judicial foreclosure proceedings were initiated in Orange County, New York.

118) The MASTR Asset Backed Securities Trust 2006 FRE-1 with the cut-off date of February 1, 2006 (hereinafter "MASTR 2006 FRE-1") is a Mortgage Backed Securities Trust formed under New York Trust Laws and at the time of formation included.

Depositor: Mortgage Asset Securitization Transactions, Inc.

Issuer: MASTR Asset Backed Securities 2006 FRE-1 (the "Trust")

Seller: UBS Real Estate Securities Inc.

Master Servicer: Wells Fargo Bank, N.A.

Trustee: U.S. Bank, National Association

119) . During the periods of 2004, 2005 and 2006, "Fremont Investment and Loan" sought to sell residential mortgage loans by means of securitization transactions. One of these transactions was called MASTR Asset Backed Securities Trust 2006 FRE-1, Mortgage Pass-Through Certificates, Series 2006-FRE-1 with the cut-off date of February 1, 2006 (hereinafter "MASTR 2006 FRE-1") it is believed and alleged that Plaintiff's note may have been placed into this trust over 4 years after the cutoff date for such trust, as no assignment has been recorded to confirm this prior to the unrecorded and/or fabricated assignment of the Mortgage that Rosicki Rosicki & Associates, P.C. relied upon to file the Foreclosure Complaint on or about December 26, 2006. Such transfer is VOID by strict New York Trust Laws which govern such a Mortgage Backed Security.

120) "Wells Fargo Bank N.A." served as the Master Servicer, Servicer and Trust Administrator for the "MASTR 2006 FRE-1" and "UBS Real Estate Securities Inc." served as the "Seller" and "Sponsor" and Mortgage Asset Securitization Transactions, Inc., served as the Depositor for the "MASTR 2006 FRE-1" true sale. The sale was needed to qualify for the tax benefits of a REMIC transaction. This transaction was beneficial for the investors and helped to fuel massive securitization transactions such as "MASTR 2006 FRE-1".

121) "MASTR 2006 FRE-1" was issued on February 25, 2006. The MASTR 2006 FRE-1 mortgage pool consisted of the "Mortgage Pool" which consisted of two loan groups ("Loan Group 1" and "Loan Group 2" and each a "Loan Group") of fixed-rate, conventional, fully-amortizing mortgage loans (the "Group 1 Mortgage Loans" and "Group 2 Mortgage Loans" and collectively, the "Mortgage Loans") secured by first liens on one- to four-family properties. All of the Mortgage Loans were originated or acquired by Fremont Investment and Loan, which is not an affiliate of the Depositor and the Underwriter.

122) In addition, certain of the Mortgage Loans were originated using underwriting standards that are different from, and in certain respects less stringent than, the general underwriting standards of Fremont. The "Cut-Off Date" was February 1, 2006. The offering size was $472,910,000. The Securities and Exchange file number is 333-124678-19, and the 425 B Prospectus Offering Documents are Form 424B5 - Prospectus [Rule 424(b)(5)] SEC Accession No. 0000882377-06- 000571 which was filed on 2- 23-2006.

123) The Defendant Trust herein named as "all persons claiming by, through, or under such person, all persons unknown, claiming any legal or equitable right, title, estate, lien, or interest in the property described in the complaint adverse to Plaintiffs title thereto" (hereinafter referred to as "the unknown defendants") are unknown to Plaintiffs. These unknown Defendants, and each of them, claim some right, title, estate, lien, or interest in the hereinafter-described property adverse to Plaintiffs' title; and their claims, and each of them, constitute a cloud on Plaintiffs title to that property.

124) Plaintiffs are ignorant of the true names and capacities of "Defendants" sued herein as "DOES" 1 through 150, and there sue these "Defendants" by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

125) "DOES" 1 through 150, and therefore sue these "Defendants" by such fictitious names Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.

126) The Defendant U.S. Bank, National Association ("U.S. Bank") as nominal trustee for the holders for various mortgages and mortgage-backed securities, has filed thousands of foreclosures actions in state and federal courts in New York and around the country, including the Plaintiffs, under false pretenses, alleging to be owner or holder of the underlying notes and mortgages when in fact it is not, and without complying with New York law governing its activities as a trust company.  These filings represent a pattern of corrupt and illegal activity as defined by New York law through which U.S. Bank has charged millions in fees, and court costs and other expenses against Plaintiffs' property.

127) U.S. Bank has routinely filed suit against homeowners, and on many occasions received distributions from the sale of these properties, without possessing legally enforceable, assignments which demonstrate the chain of ownership and recorded assignment of the mortgages from the actual mortgagees.  Under New York law, "before an entity would be

entitled to receive a distribution from the sale [real] property, their interest therein must have been recorded in accordance with New York law.

128) Moreover, Defendant U.S. Bank, as trustee is engaging in a wide variety of activities as trustee in this state, without adhering to the requirements of New York Trust laws.  Pledging the securities required in New York trust laws, is a necessary prerequisite to engaging in the trust business in New York, even for a national bank such as U.S. Bank.

129) Defendant U.S. Bank's pattern and practice of filing foreclosure actions in state and federal courts without the requisite legal title, while falsely stating that it had such title, and while lacking the right to engage in the trust business in New York, constitutes a "false, deceptive or misleading representation or means"  in connection with the collection of a debt, in violation of the Federal Fair Debt Collection Practices Act, 15 U.S.C 1692(e).  It also constitutes an offense against justice and administration in violation of New York State courts, and therefore constitutes a pattern of corrupt and illegal activity as required to maintain an action for violation New York's RICO statute.  The Defendant's law firms have an independent obligation to the Courts in New York and to plaintiffs not to engage in such misconduct, but they nevertheless served as a vehicle through which U.S. Bank has perpetrated its deceptive and unauthorized conduct.

130) In this action, plaintiffs seeks to recovery actual and statutory damages, including treble damages under New York RICO statutes, as well as attorney fees and costs permitted by law.  In addition Plaintiffs seek to recover from Defendant U.S. Bank the charges it collected from Plaintiffs, as well any interest in real property it acquired illegally, and to collect all fees obtained from these improper foreclosure filings.

131) The Court has original jurisdiction over Plaintiffs' Fair Debt Collection Practices Act claim pursuant to 28 U.S.C. 1331.

132) The Court has supplemental jurisdiction over the other claims in this Second Amended Complaint under 28 U.S.C. 1367(a), because together Plaintiffs' claims from part of the same case or controversy under Article III of the United States Constitution.

133) Defendant U.S. Bank and its agents and/or employees [America's Servicing Company, Wells Fargo Bank and Rosicki, Rosicki & Associates, P.C.] are "debt collectors" as defined in 15 U.S.C. 1692(e), because they regularly use instrumentalities of interstate commerce, and the mails, in attempting to collect, directly or indirectly, debts owed or due or asserted to be owned

or due another, namely, the actual lenders, mortgagors, and certificate-holders under the above-referenced pooling and servicing agreements.  Upon information and belief, the defendant law firm regularly represented defendant U.S. Bank in suits against homeowners to collect on notes and foreclose on mortgages.

## BACKGROUND – THE TRUSTS

134) U.S. Bank National Association ("Defendant U.S. Bank" or "Trustee"), is the Trustee of numerous trusts for the benefit of investors (called "certificateholders").

135) The document providing for the establishment and administration of each Trust is called a "Pooling and Servicing Agreement" ("PSA").

136) The corpus of MASTR 2006 FRE-1 Trust consists primarily of residential mortgage loans made by Fremont Investment and Loan.

137) Based upon the assumption that the loans were deposited into each Trust, the borrowers began making payments to each Trust through Wells Fargo Bank d/b/a America's Servicing Company as Master Servicer for each Trust.

138) Wells Fargo Home Mortgage is also known as America's Servicing Company. Throughout the remainder of the Second Amended Complaint, this entity and its parent will be referred to as the "Master Servicer".

139) When the Master Servicer collects loan payments from borrowers, the Master Servicer transfers those payments less allowable deductions to the Defendant, who as Trustee of each Trust distributes those payments to each Trust's beneficiaries — the certificateholders — such as Plaintiffs. Thus, the certificateholders are entitled to participation in the cash flow the Master Servicer collects from borrowers relating to the mortgage loans each Trust holds on behalf of the certificateholders.

140) Therefore, each Trust is primarily administered by two entities: The Defendant "Trustee", who is the "face" of each Trust with the Trust beneficiaries such as Plaintiff, and the "Master Servicer", who is the "face" of each Trust with borrowers. The entire process is graphically illustrated as follows:

141) Because a trustee such as Defendant holds the trust corpus for the beneficiaries, a servicer such as the Master Servicer here will act in the name of the trustee when taking action against borrowers, which includes the servicer in the name of a trustee bringing foreclosure actions against borrowers who are allegedly delinquent on their loan payments. Government officials who are unaware of this practice thus often blame a trustee for the acts of the servicer, even though the trustee is typically only a nominal party to the foreclosure. As set forth below, both the Defendant and each Trust have suffered significant reputational damage as a consequence of the allegations leveled against the Master Servicer.

## BACKGROUND – GENERAL ALLEGATIONS

142) Recent revelations from a variety of credible sources indicate that the Trustee and the Master Servicer may be acting for their own benefit rather than for the benefit of investors. Furthermore, the acts detailed below indicate that the Trustee and the Master Servicer may be damaging the borrowers whose loans make up each Trust's corpus and undermining efforts to restore economic prosperity to this Country.

## BACKGROUND – THE NATIONAL FINANCIAL CRISIS

143) As this Court is well aware, a national financial crisis exists, which was primarily caused by irresponsible lending practices and leveraging of debt on the part of the nation's largest financial institutions.

144) This financial crisis required an unprecedented federal bailout of the nation's largest financial institutions, including the Defendant Trustee and the Master Servicer described in this Complaint. The Defendant Trustee received $6 billion under the Capital Purchase Program, while the Master Servicer received $25 billion under the Capital Purchase Program and $20 billion under the Targeted Investment Program.

## BACKGROUND – THE NATIONAL FORECLOSURE CRISIS

145) As this Court also understands, a national foreclosure crisis accompanies the financial crisis. "The Federal Reserve considers the record rate of mortgage delinquencies, foreclosures and their impacts on communities an urgent problem." See http://data.newyorkfed.org/creditconditionsmap/#. Losing a home to foreclosure can be one of the most serious, stressful, and devastating events in a person's life. During the foreclosure

process, borrowers should be treated with respect, and the foreclosure process should be performed in a manner that is honest, legal, and in compliance with due process of law.

146)    Borrowers losing homes to foreclosure can fall into a number a categories, examples of which include the following borrowers who are working to save their homes from foreclosure: (1) honest borrowers experiencing difficult life events ("Good Faith Borrowers"); and (2) victims of predatory lending activities who were misled or outright defrauded into obtaining a loan they could not afford ("Predatory Lending Victims"). The Master Servicer should provide Good Faith Borrowers a reasonable opportunity to stay in their homes where that result exceeds the net present value of foreclosing. The entity (or its successor in interest) who sold a Trust a loan made to a Predatory Lending Victim should repurchase the loan from the Trust as it warranted it would upon sale and face the consequences of its wrongful acts against the borrower under applicable law.

147)    Borrowers losing homes to foreclosure can also fall into other categories, including the following: (1) borrowers who cannot make net present value positive payments under any circumstances and/or have abandoned the premises ("Abandoned Properties"); and (2) borrowers who engaged in property-flipping schemes, straw-man purchases, or other fraudulent acts, which often are accompanied by a failure to make any payments to a Trust ("Fraudulent Borrowers"). Abandoned Properties and Fraudulent Borrowers (who typically either abandon the property or start to destroy it) are a source of great concern to local governments charged with maintaining quality of life in these neighborhoods. There is virtually no dispute that some foreclosures – including those involving Abandoned Properties and Fraudulent Borrowers – are necessary from both a lending and societal perspective ("Valid Foreclosures"). Valid Foreclosures should be done quickly to reduce the decay and decimation to a neighborhood that accompanies abandoned or vandalized properties.

## BACKGROUND – DEFENDANT'S OBLIGATION TO ACQUIRE THE TRUST CORPUS

148) Each PSA contained express terms for the delivery of the loans into the Trust. Specifically, each PSA contained language to the effect that the Depositor would deliver certain critical documents evidencing and supporting each loan to the Defendant Trustee:

149) In connection with the transfer and assignment set forth in clause (b) above, the Depositor has delivered or caused to be delivered to the Trustee (or, in the case of the Delay Delivery Mortgage Loans that are Initial Mortgage Loans, will deliver or cause to be delivered to the Trustee within thirty (30) days following the Closing Date and in the case of the Delay Delivery Mortgage Loans that are Supplemental Mortgage Loans, will deliver or cause to be delivered to the Trustee within twenty (20) days following the applicable Supplemental Transfer Date) for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

150) (i) the original Mortgage Note endorsed by manual or facsimile signature in blank in the following form: "Pay to the order of _____ without recourse," with all intervening endorsements showing a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note); or [...]

(iii) in the case of each Mortgage Loan that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage, (which may be included in a blanket assignment or assignments), together with, except as provided below, all interim recorded assignments of such mortgage (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which the assignment relates); provided that, if the related Mortgage has not been returned from the applicable public recording office, such assignment of the Mortgage may exclude the information to be provided by the recording office; provided, further, that such assignment of Mortgage need not be delivered in the case of a Mortgage for which the related Mortgaged Property is located in the Commonwealth of Puerto Rico;

MASTR 2006 FRE-1 PSA § 2.01(c).

151) 30. Moreover, the Trustee acknowledged the receipt of these critical documents and promised to hold them "in trust for the exclusive use and benefit of all present and future Certificateholders." The Defendant Trustee further acknowledged that "it will maintain possession of the Mortgage Notes in the State of New York":

152) The Trustee acknowledges receipt of the documents identified in the Initial Certification in the form annexed hereto as Exhibit F-1 and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage Files, and that it holds or will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders. The Trustee acknowledges that it will maintain possession of the Mortgage Notes in the State of New York, unless otherwise permitted by the Rating Agencies.

MASTR 2006 FRE-1 PSA § 2.02(a).

153) The Trustee was required to execute "the Initial Certification in the form annexed hereto as Exhibit F-1" (attached to this Complaint as "Exhibit F-1"), in which it was to state that it had both received a Note and an assignment, and that it had undertaken a "review and examination" of those documents:

154) In accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), the undersigned, as Trustee, hereby certifies that, as to each Initial Mortgage Loan listed in the Mortgage Loan Schedule (other than any Initial Mortgage Loan paid in full or listed on the attached schedule) it has received:

(i) (a) the original Mortgage Note endorsed in the following form: "Pay to the order of _____, without recourse" or (b) with respect to any Lost Mortgage Note, a lost note affidavit from Fremont stating that the original Mortgage Note was lost or destroyed; and (ii) a duly executed assignment of the Mortgage (which may be included in a blanket assignment or assignments).  Based on its review and examination and only as to the foregoing documents, such documents appear regular on their face and related to such Mortgage Loan.

MASTR 2006 FRE-1 PSA Form S-3.

155) The Trustee subsequently had to issue a Final Certification (attached to this Second Amended Complaint as "Exhibit H-1") with respect to the loans:

Not later than 90 days after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Fremont (on its own behalf and on behalf of Fremont) a Final Certification with respect to the Initial Mortgage Loans in the form annexed hereto as

Exhibit H-1, with any applicable exceptions noted thereon. If, in the course of such review, the Trustee finds any document constituting a part of a Mortgage File which does not meet the requirements of Section 2.01, the Trustee shall list such as an exception in the Final Certification [....]

MASTR 2006 FRE-1 PSA § 2.02(a).

156) It was also the Trustee's duty to affix certain language to each assignment of

Mortgage:

As promptly as practicable subsequent to such transfer and assignment, and in any event, within thirty (30) days thereafter, the Trustee shall (i) as the assignee thereof, affix the following language to each assignment of Mortgage: "MASTR 2006 FRE-1, U.S. Bank, as trustee", (ii) cause such assignment to be in proper form for recording in the appropriate public office for real property records and (iii) cause to be delivered for recording in the appropriate public office for real property records the assignments of the Mortgages to the Trustee, except that, with respect to any assignments of Mortgage as to which the Trustee has not received the information required to prepare such assignment in recordable form, the Trustee's obligation to do so and to deliver the same for such recording shall be as soon as practicable after receipt of such information and in any event within thirty (30) days after receipt thereof and that the Trustee need not cause to be recorded any assignment which relates to a Mortgage Loan, (a) the Mortgaged Property and Mortgage File relating to which are located in New York or (b) in any other jurisdiction (including Puerto Rico) under the laws of which in the opinion of counsel the recordation of such assignment is not necessary to protect the Trustee's and the Certificateholders' interest in the related Mortgage Loan.

MASTR 2006 FRE-1 PSA § 2.01(c).

157) Furthermore, numerous provisions of the PSA made clear that the Trustee was required

to maintain possession of the Mortgage File, which contained among other things the Note and

any assignments, and that possession of the Mortgage File by any other entity was to be a closely

guarded and monitored exception rather than the rule.

For example:

a. *"The Trustee shall retain possession and custody of each Mortgage File* in accordance with and subject to the terms and conditions set forth herein. *The Master Servicer shall promptly deliver to the Trustee*, upon the execution or receipt thereof, *the originals of such other documents or instruments constituting*

*the Mortgage File as come into the possession of the Master Servicer from time to time."*

MASTR 2006 FRE-1 PSA § 2.02(d) (emphasis added).

    b. "With respect to any Substitute Mortgage Loan or Loans, sold to the Depositor by a Seller, (on its own behalf and on behalf of Fremont) *shall deliver to the Trustee for the benefit of the Certificateholders the Mortgage Note, the Mortgage, the related assignment of the Mortgage*, and such other documents and agreements as are required by Section 2.01, with the Mortgage Note endorsed and the Mortgage assigned as required by Section 2.01."

MASTR 2006 FRE-1 PSA § 2.03(c) (emphasis added).

    c. "Upon the payment in full of any Mortgage Loan, or the receipt by the Master Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Master Servicer will immediately notify the Trustee by delivering, or causing to be delivered a "Request for Release" substantially in the form of Exhibit N. Upon receipt of such request, the Trustee shall promptly release the related Mortgage File to the Master Servicer, and the Trustee shall at the Master Servicer's direction execute and deliver to the Master Servicer the request for reconveyance, deed of reconveyance or release or satisfaction of mortgage or such instrument releasing the lien of the Mortgage in each case provided by the Master Servicer, together with the Mortgage Note with written evidence of cancellation thereon."

MASTR 2006 FRE-1 PSA § 3.12.

    d. "From time to time and as shall be appropriate for the servicing or foreclosure of any Mortgage Loan, including for such purpose, collection under any policy of flood insurance, any fidelity bond or errors or omissions policy, or for the purposes of effecting a partial release of any Mortgaged Property from the lien of the Mortgage or the making of any corrections to the Mortgage Note or the Mortgage or any of the other documents included in the Mortgage File, the Trustee shall, upon delivery to the Trustee of a Request for Release in the form of Exhibit M signed by a Servicing Officer, release the Mortgage File to the Master Servicer. Subject to the further limitations set forth below, *the Master Servicer shall cause the Mortgage File or documents so released to be returned to the*

> *Trustee when the need therefor by the Master Servicer no longer exists*, unless the Mortgage Loan is liquidated and the proceeds thereof are deposited in the Certificate Account, in which case the Master Servicer shall deliver to the Trustee a Request for Release in the form of Exhibit N, signed by a Servicing Officer." MASTR 2006 FRE-1 PSA § 3.12 (emphasis added).

Each "Request for Release" referenced above make it clear that they are to be used for individual loans, not for the entire loan pool.

> e. "Notwithstanding any other provisions of this Agreement, the Master Servicer shall transmit to the Trustee as required by this Agreement all documents and instruments in respect of a Mortgage Loan coming into the possession of the Master Servicer from time to time and shall account fully to the Trustee for any funds received by the Master Servicer or which otherwise are collected by the Master Servicer as Liquidation Proceeds, Insurance Proceeds or Subsequent Recoveries in respect of any Mortgage Loan." MASTR 2006 FRE-1 PSA § 3.13 (emphasis added).

158) Even the PSA's "fail safe" provision (providing that if a true sale does not take place then the Trustee has a security interest in the loans) required that the Mortgage File be delivered to the Trustee:

> a. In connection with the pledge of the fail safe security interest, "[t]he Depositor hereby represents that: […] (v) All original executed copies of each Mortgage Note that are required to be delivered to the Trustee pursuant to Section 2.01 have been delivered to the Trustee." MASTR 2006 FRE-1 PSA § 10.04(b).

> b. "The Master Servicer shall take such action as is reasonably necessary to maintain the perfection and priority of the security interest of the Trustee in the Mortgage Loans; provided, however, that *the obligation to deliver the Mortgage File to the Trustee* pursuant to Section 2.01 shall be solely the Depositor's obligation and *the Master Servicer shall not be responsible for the safekeeping of the Mortgage Files by the Trustee*."

MASTR 2006 FRE-1 PSA § 10.04(c) (emphasis added).

## BACKGROUND – DEFENDANT U.S. BANK'S
## FAILURE TO ACQUIRE THE TRUST CORPUS

159) Based on the following allegations, it is apparent that the Defendant knowingly failed in its obligation to receive, process, maintain, and hold all or part of the Mortgage Files as

48

required under the PSA. As a consequence, Certificateholders did not acquire residential mortgage-backed securities, but instead acquired securities backed by nothing at all.

160) In a case styled Kemp v. Countrywide Home Loans, Inc., 440 B.R. 624 (D.N.J. Bankr. 2010), the Master Servicer, identifying itself as the servicer for Defendant, filed a secured claim in the bankruptcy of homeowner and debtor Kemp. Kemp filed an adversary complaint against the Master Servicer asserting that "the Bank of New York cannot enforce the underlying obligation." Id. at 626.

161) At trial, a supervisor and operational team leader for the Litigation Management Department for the Master Servicer testified that "to her knowledge, the original note never left the possession of Countrywide, and that the original note appears to have been transferred to Countrywide's foreclosure unit, as evidenced by internal FedEx tracking numbers. She also confirmed that the new allonge had not been attached or otherwise affixed to the note. She testified further that it was customary for Countrywide to maintain possession of the original note and related loan documents." *Id.* at 628.

162) Summarizing the record, the New Jersey Bankruptcy Court found that:

[W]e have established on this record that at the time of the filing of the proof of claim, the debtor's mortgage had been assigned to the Bank of New York, but that Countrywide did not transfer possession of the associated note to the Bank.  Shortly before trial in this matter, the defendant executed an allonge to transfer the note to the Bank of New York; however, the allonge was not initially affixed to the original note, and possession of the note never actually changed. The Pooling and Servicing Agreement required an indorsement and transfer of the note to the Trustee, but this was not accomplished prior to the filing of the proof of claim. The defendant has now produced the original note and has apparently affixed the new allonge to it, but the original note and allonge still have not been transferred to the possession of the Bank of New York. Countrywide, the originator of the loan filed the proof of claim on behalf of the Bank of New York as Trustee, claiming that it was the servicer for the loan. Pursuant to the PSA, Countrywide Servicing, and not Countrywide, Inc., was the master servicer for the transferred loans. At all relevant times, the original note appears to have been either in the possession of Countrywide or Countrywide Servicing. Id. at 629.

163) "With this factual backdrop", the New Jersey Bankruptcy Court turned "to the issue of whether the challenge to the proof of claim filed on behalf of the Bank of New York, by its servicer Countrywide, can be sustained", and found that:

> Countrywide's claim here must be disallowed, because it is unenforceable under New Jersey law on two grounds. First, under New Jersey's Uniform Commercial Code ("UCC") provisions, the fact that the owner of the note, the Bank of New York, never had possession of the note, is fatal to its enforcement. Second, upon the sale of the note and mortgage to the Bank of New York, the fact that the note was not properly indorsed to the new owner also defeats the enforceability of the note. *Id.* at 629-630.

164) To test the Kemp testimony concerning endorsements, FORTUNE magazine "examined [104] foreclosures filed in two New York counties (Westchester and the Bronx) between 2006 and 2010", and reported the following:

> None of the 104 Countrywide loans were endorsed by Countrywide – they included only the original borrower's signature. Two-thirds of the loans made by other banks also lacked bank endorsements. The other third were endorsed either directly on the note or on an allonge, or a rider, accompanying the note. The lack of Countrywide endorsements, combined with the bank's representation to the court that these documents are accurate copies of the original notes, calls into question the securitization of these loans, as well as Bank of New York's right, as trustee, to foreclose on them. These notes ostensibly belong to over 100 different Countrywide securities and worse, they were originally made as long ago as 2002. If the lack of endorsement on these notes is typical -- and 104 out of 104 suggests it is -- the problem occurs across Countrywide securities and for loans that pre-date the peak-bubble mortgage frenzy.

165) The lack of Countrywide endorsements also corroborates [the Master Servicer employee who testified in *Kemp*], who said that in her 10 years at Countrywide she had never seen a note with an endorsement, and that as foreclosures had been increasingly litigated, she had been handling the original notes, not just the copies scanned into the bank's database.

166) The process adopted by the Proposed Settlement Agreement – where the Master Servicer instead of the Trustee conducts an inventory of the Mortgage File – demonstrates that

Defendant failed to receive and retain possession of all or part of the Mortgage Files, which failure persists to this day.

167) Defendant had the opportunity to demonstrate that it possesses the Mortgage Files through discovery served by Plaintiff in this action. Defendant has failed to answer Plaintiff's properly propounded and narrowly tailored discovery requests.

168) The Attorneys General of both New York and Delaware recently requested information from Defendant to determine whether the Trusts for which Defendant served as Trustee "were properly documented and valid". *See* Gretchen Morgensen, *Two States Ask if Paperwork in Mortgage Bundling Was Complete*, NEW YORK TIMES, June 12, 2011, at http://www.nytimes.com/2011/06/13/business/13mortgage.html.

The Attorney General of New York, moreover, has filed a proposed Verified Pleading in Intervention, dated August 4, 2011, in *In the matter of the application of The Bank of New York Mellon*, Index No. 651786/2011, which alleges that Defendant not only knew that Mortgage Files were not transferred properly (¶¶ 23-28), but also breached its duty to notify Certificateholders of this fact (¶¶ 29-34).

## BACKGROUND – THE COVER-UP THROUGH CERTIFICATIONS AND SECURITIES FILINGS

169) For older trusts, the Master Servicer, consistent with contractual obligations, annually and at its own expense causes a nationally or regionally recognized independent public accounting firm (which is a member of the American Institute of Certified Public Accountants) to furnish a statement to Defendant to the effect that such firm has examined certain documents and records relating to the servicing of the Mortgage Loans and that, on the basis of such examination, such servicing has been conducted in compliance with the Master Servicer's contractual obligations, with any significant exceptions or errors reported.

170) For newer trusts, the Master Servicer and the Trustee, pursuant to Regulation AB of Rule S-X of the Securities Exchange Act, annually must provide to the Depositor individual Assertions [or Assessments] of Compliance with Applicable Servicing Criteria, which are assessments of compliance or non-compliance with applicable "Servicing Criteria" as defined and described in Item 1122(d) of Regulation AB (collectively, "Servicing Criteria

51

Assessments"). For the Master Servicer, Servicing Criteria Assessments relate to the Master Servicer's compliance or non-compliance with a wide range of individual servicing or administrative tasks, record creation and delivery, and processes required to service and administer each mortgage loan properly under the pooling and servicing agreement, e.g., reconciling borrower payments, posting loan related disbursements, timely reporting to investors, employment of proper loss mitigation practices, and the like. For the Trustee, the Servicing Criteria Assessments include its compliance or non-compliance under Item 1122(d)(4)(i) and (ii): (4) Pool asset administration.

(i) Collateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents.

(ii) Pool assets and related documents are safeguarded as required by the transaction agreements.

171) For each newer Trust, the Depositor must file with the SEC the Servicing Criteria Assessments executed by the Master and the Trustee, and the SEC makes those Servicing Criteria Assessments available for public viewing, including by investors and rating agencies. In addition, under Regulation AB and the related PSA, the Trustee and the Master Servicer also must cause their respective approved registered public accounting firms to deliver separate attestation reports (collectively, "Accountant Attestation Reports") to the SEC regarding the Trustee's and the Master Servicer's individual assessments of compliance with the Applicable Servicing Criteria.

172) For each newer Trust, the Master Servicer and the Trustee filed Servicing Criteria Attestations indicating their respective compliance with the Applicable Servicing Criteria, including the Trustee's attestations that the "pool assets and related documents are safeguarded as required by the transaction documents" and that "collateral security on pool assets is maintained as required by transaction documents…" In the Servicing Criteria Attestation Reports executed and filed with the SEC in accordance with the Trusts' pooling and servicing agreements and Regulation AB, both the Trustee and the Servicer asserted that they were "in material compliance with the Applicable Servicing Criteria."

173) As set forth elsewhere in this Second Amended Complaint, the Servicing Criteria Attestations of the Trustee and of the Master Servicer were untrue, inaccurate and misleading, to the detriment of the Plaintiffs.

174) On information and belief, based on the public allegations detailed herein, any Master Servicer or Trustee self-assessment or independent accounting firm report produced by a competent nationally or regionally recognized independent public accounting firm should have reported material non-compliance with certain servicing criteria.

175) On information and belief, based on the language of certain PSAs, the Master Servicer each year provides to Defendant the Report of an Independent Accounting Firm. On information and belief, Defendant has not shared with Certificateholders at large findings regarding any material non-compliance identified.

176) Some PSAs require the Trustee to provide the Report of an Independent Accounting Firm to any Certificateholder who requests it. Based on the Affidavit of a representative of a Certificateholder in another trust, however, the Trustee does not provide the Report of an Independent Accounting Firm to Certificateholders when requested to do so.

## BACKGROUND – THE COVER-UP IN FORECLOSURE AND PROPERTY TRANSFER FILINGS

177) In a February 19, 2010, deposition in a Massachusetts bankruptcy case, Renee D. Hertzler, an employee of the Master Servicer, admitted under oath to signing seven to eight thousand legal documents a month outside the presence of a notary and without reviewing the documents prior to signing them. Ms. Hertzler testified "I typically don't read them because of the volume that we sign."

178) Ms. Hertzler further admitted to signing affidavits as the Vice President of the Defendant The Bank of New York Mellon when, in fact, she was not and never had been employed by Defendant.

179) Tam Doan worked on pre-sale foreclosures for the Master Servicer in Southern California. While his job required him to sign various legal documents, he primarily handled notices to delinquent borrowers that their loans were proceeding to foreclosure. His signature

constituted an affirmation that the Master Servicer had reviewed the loan and it did not qualify for modification. Yet, Mr. Doan told CNN that "[w]e had no knowledge of whether the foreclosure could proceed or couldn't, but regardless, we signed the documents to get these foreclosures out of the way." In some cases he claimed that he did not even know what kind of document he was signing. "I had no idea what I was signing," said Doan. "Either you were in or you were out."

180) This practice of signing documents in an assembly-line manner and swearing to personal knowledge of facts that the affiant has not even reviewed has popularly become known as "robo-signing".

181) The media revelations about robo-signing were a topic of discussion during a Congressional hearing3 on the financial regulatory overhaul. A WASHINGTON POST article dated September 30, 2010, entitled *7 Major Lenders Ordered to Review Foreclosure Procedures* quoted John Walsh, acting director of the Office of the Comptroller of the Currency, as telling lawmakers that some lenders "clearly had  deficiencies" in their foreclosure systems. Accordingly, seven banks, including the Master Servicer, were ordered to review their foreclosure processes.

182) In her testimony before this same Congressional panel, Federal Deposit Insurance Corp. Chairman Sheila C. Bair described the issue of document processing errors as "troubling." She also said "it's just a further indication of how wrong we went with the mortgage origination process and securitization process."

183) According to the Congressional Oversight Panel's November Oversight Report, "Affidavits such as the ones involved in the foreclosure irregularities are statements made under oath and thus clearly fall within the scope of the perjury statutes." Congressional   Oversight Panel, November Oversight Report, Nov. 16, 2010, at 42.

184) On October 1, 2010, the Master Servicer announced that it was putting foreclosures on hold in the 23 judicial foreclosure states.  According to the Master Servicer's spokesman Dan Frahm:

> "To be certain affidavits have followed the correct procedures, Bank of America will delay the process in order to amend all affidavits in foreclosure cases that have not yet gone to judgment."4

185) In October 2010, Attorneys General in California, Florida, Connecticut, Illinois, Ohio, and Colorado called for foreclosure moratoriums, and then-New York Attorney General and now Governor Andrew Cuomo began an investigation of the issue.5 On October 4, 2010, the Attorney General of Texas sent notices to the Master Servicer and 29 other mortgage companies in the state demanding that all foreclosures be halted until all "robo-signers" were identified, remedial steps taken to deal with legally insufficient documentation, and proper assurances of compliance with Texas law were given.6 On October 5, 2010, Massachusetts Attorney General Martha Coakley asked the Master Servicer and other banks to suspend foreclosures and evictions in that state, and Delaware Attorney General Joseph R. Biden, III called on the Master Servicer and other banks to halt all pending foreclosures until a thorough review of their foreclosure policies and procedures was complete.7 That same day North Carolina Attorney General Roy Cooper asked the Master Servicer and 13 other mortgage companies to suspend foreclosures in his state.8 All told, at "least 10 states - with Iowa and Delaware being the latest – are seeking to expand a voluntary freeze on foreclosures by some of the nation's largest mortgage lenders to include more companies and more regions.

186) The Master Servicer responded on October 8, 2010, by releasing the following statement: "Bank of America has extended our review of foreclosure documents to all fifty states. We will stop foreclosure sales until our assessment has been satisfactorily completed. Our ongoing assessment shows the basis for our past foreclosure decisions is accurate. We continue to serve the interests of our customers, investors and communities. Providing solutions for distressed homeowners remains our primary focus."10. In response to the ongoing dissemination of information regarding robo-signing, in October 2010, the Attorneys General of all 50 states formed the Mortgage Foreclosure Multistate Group. In a joint statement issued October 13, 2010, the group opined that robo-signing "may constitute a deceptive act and/or an unfair practice or otherwise violate state laws."

187) On October 18, 2010, the Master Servicer released a statement that "We have reviewed our process for resubmission of foreclosure affidavits in the 23 judicial states with key stakeholders, including our largest investors. Accordingly, Bank of America today began the process of preparing foreclosure affidavits for submission in 102,000 foreclosure actions in which judgment is pending. We anticipate that by Monday, Oct. 25, the first foreclosure

affidavits will be resubmitted to the courts. Upon judgment, foreclosure dates will be set and Bank of America will resume foreclosure sales in such proceedings in the 23 judicial states."

188) However, on October 24, 2010, THE WALL STREET JOURNAL reported that the Master Servicer admitted finding errors in ten to twenty-five out of the first several hundred foreclosure files it examined. The mistakes included lack of signatures, missing files, and inconsistent information about the property and the payment history. In addition, a Master Servicer spokesman admitted that, rather than review all of the files for accuracy, the Master Servicer only reviewed several hundred, which represents less than 1% of the foreclosure filings it intends to resubmit to the courts. The WASHINGTON POST quoted Master Servicer spokesman Dan Frahm as stating: "We never said that our review tested each of these previously filed affidavits in these 102,000 proceedings."

189) Thus, despite the Master Servicer's review of its "process for resubmission of foreclosure affidavits in the 23 judicial states with key stakeholders", the Master Servicer review appears to be little more than a "robo-review", which is insufficient to determine whether or not the foreclosures are fully compliant with law.

190) On May 4, 2011, the Register of Deeds of Guilford County, Jeff L. Thigpen, surveyed various recorded documents filed with his office. Scores of filings in the name of Bank of America, N.A. were signed by Christie Baldwin. Filings in the name of Bank of New York Trust Company, N.A. were signed by Pat Kingston, who also signed for numerous other entities, including EMC Mortgage Corp., Citi Residential Lending Inc., Mortgage Electronic Registration Systems Inc., and Wells Fargo Bank, N.A. "Pat Kingston" and "Christie Baldwin" respectively used eight and twelve different signatures in Guilford County.

191) During the fourth quarter of 2010, the Office of Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, and the Federal Reserve Board undertook a coordinated horizontal examination of foreclosure processing at the nation's 14 largest federally regulated mortgage servicers, including the Master Servicer. As John Walsh, Acting Comptroller of the Currency testified before the Senate Committee on Banking, Housing, and Urban Affairs on February 17, 2011:

In general, the examinations found critical deficiencies and shortcomings in foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third party law firms and vendors. These deficiencies have resulted in violations of state and local foreclosure laws, regulations, or rules and have had an adverse affect on the functioning of the mortgage markets and the U.S. economy as a whole. By emphasizing timeliness and cost efficiency over quality and accuracy, examined institutions fostered an operational environment that is not consistent with conducting foreclosure processes in a safe and sound manner.

192) On April 13, 2011, the Office of the Comptroller of the Currency "announced formal enforcement actions against eight national bank mortgage servicers and two third-party servicer providers for unsafe and unsound practices related to residential mortgage loan servicing and foreclosure processing." The eight servicers included the Master Servicer. *See* http://occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47.html.

193) That same date, the Office of the Comptroller of the Currency signed and published a consent order styled *In the Matter of Bank of America, N.A.* (the "Consent Order"), which found that the Master Servicer "engaged in unsafe or unsound banking practices" by reason of the following conduct:

In connection with certain foreclosures of loans in its residential mortgage servicing portfolio, the Bank: (a) filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

(b) filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; (c) litigated

foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time; (d) failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes; (e) failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and (f) failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

194) On May 20, 2011, the Connecticut Attorney General sent a letter to the Master Servicer regarding the "numerous complaints from consumers whose loans are served by Bank of America" received by his office:

Just this week my office received a complaint from a former Navy Corpsman who described his two-year ordeal with the bank as a "nightmare." This customer's experience is far from unique. Indeed, our colleagues at the Connecticut Department of Banking and the Connecticut Fair Housing Center report that they continue to assist many consumers who are experiencing significant difficulties with Bank of America. Despite having had more than two years to "right-size" your staff and establish effective procedures and systems, Bank of America has so far not prevented even the most common consumer complaints regarding lost documentation, poor communication, misinformation, dual tracking, and lack of a single point of contact. Such consumer complaints are common and a clear indication that Bank of America has not devoted sufficient resources toward addressing its well-documented default servicing problems.

http://www.ct.gov/ag/lib/ag/press_releases/2011/brianmoynihanboa_.pdf

195) According to the Associated Press, the Master Servicer continues to engage in robo-signing despite entering into the consent order:

Since [June 7, 2011], [John] O'Brien[, the registrar of deeds in Essex County,] has received nine documents from Bank of America purportedly signed by Linda Burton, another name on authorities' list of known robo-signers. For years, his office has regularly received documents signed with Burton's name but written in such vastly

different handwriting that two forensic investigators say it's highly unlikely it all came from the same person.

O'Brien returned the nine Burton documents to Bank of America in mid-June. He told the bank he would not file them unless the bank signed an affidavit certifying the signature and accepting responsibility if the title was called into question down the road. Instead, Bank of America sent new documents with new signatures and new notaries.

A Bank of America spokesman says Burton is an assistant vice president with a subsidiary, ReconTrust. That company handles mortgage paperwork processing for Bank of America.

"She signed the documents on behalf of the bank," spokesman Richard Simon says. The bank says providing the affidavit O'Brien asked for would have been costly and time-consuming. Instead, Simon says Bank of America sent a new set of documents "signed by an authorized associate who Mr. O'Brien wasn't challenging."

The bank didn't respond to questions about why Burton's name has been signed in different ways or why her signature appeared on documents that investigators in at least two states have deemed invalid.

Several attempts by the AP to reach Burton at ReconTrust were unsuccessful. O'Brien says the bank's actions show "consciousness of guilt." Earlier this year, he hired Marie McDonnell, a mortgage fraud investigator and forensic document analyst, to verify his suspicions about Burton's and other names on suspect paperwork.

She compared valid copies of Burton's signature with the documents O'Brien had received in 2008, 2009 and 2010 and found that Burton's name was fraudulently signed on hundreds of documents.

Most of the documents reviewed by McDonnell were mortgage discharges, which are issued when a home changes hands or is refinanced by a new lender and are supposed to confirm that the previous mortgage has been paid off. Bank of America declined comment on McDonnell's findings.13

Similarly, Reuters published a special report on July 19, 2011, in which it claimed that five mortgage loan servicers, including the Bank of America, had filed foreclosure documents of questionable validity since agreeing to stop doing so earlier this year. Reuters went on to describe an incident only a week earlier in which Robert Drain, United States Bankruptcy Judge for the Southern District of New York:

[O]rdered an investigation involving a foreclosure case brought by [Bank of America]. [In re: Priscilla C. Taylor, Debtor, U.S. Bankruptcy Court, Southern District of New York, Case #10-22652]. Two earlier copies of a promissory note filed in court had lacked

any endorsement, but then one appeared on the note when bank lawyers produced the original. The judge said the sudden appearance of an endorsement, and his own close look at it, raised questions about whether it has been added illegally to make the note look legitimate. It raises a sufficiently as to when and more importantly by whom this note was endorsed,' the judge said serious issue.

## BACKGROUND – IMPACT ON FORECLOSURES

196) Defendant's failure to possess the complete Mortgage File and properly execute assignments has prevented, obstructed, delayed, and/or increased the expense of otherwise proper foreclosures.

197) The nation's courts have responded to the servicers' notoriously flawed paperwork by instituting new procedures in foreclosure matters in an effort to insure the integrity of the process. For example:

a. The New York Court of Appeals implemented a new rule on October 20, 2010, requiring that every attorney handling a foreclosure matter sign a form verifying that the documentation presented to the court is valid.

b. On November 8, 2010, the Cuyahoga County Court of Common Pleas (covering Ohio's largest county including the Cleveland metro area) announced a new residential mortgage foreclosure affidavit policy that will require attorneys to provide details of their communication with the representative of the party seeking foreclosure and certify that, to the best of their knowledge, the pleadings and other court filings are complete and accurate.

c. In Maryland, the state's highest court approved new emergency measures that provide for examiners and/or special masters to scrutinize the documentation in foreclosure matters. The new rules specifically allow the courts to pass on the cost of the examinations to the firms foreclosing on debtors.

198) Due to Defendant's failings, no foreclosure can take place at the cost anticipated when Plaintiffs invested in the Trusts, because the cost of preparing foreclosure paperwork has increased exponentially.

199) Further, Defendant's failings give rise to additional expenses associated with foreclosures. Such expenses include, but are not limited to: (1) sanctions for misconduct in legal proceedings; (2) attorneys' fees and costs of filing a foreclosure complaint dismissed or delayed due to improper documentation; (3) attorneys' fees and costs of refiling or amending a foreclosure complaint or affidavit; (4) attorneys' and other professional fees related to defenses against government investigations and claims; (5) costs of evaluating servicing procedures to ensure compliance with law; (6) the payment to borrowers and/or government entities of settlements, fines, penalties, or judgments related to this issue; (7) increased costs of future foreclosures; and (8) "carrying costs" associated with delaying Valid Foreclosures such as force-placed insurance, default-related services, and taxes.

## BACKGROUND – OTHER IMPACTS

200) Defendant's failings could have an additional impact. In an exclusive report, Reuters noted on April 27, 2011 that:

The U.S. Internal Revenue Service has launched a review of the tax-exempt status of a widely-held form of mortgage-backed securities called REMICs.

The IRS confirmed to Reuters that the review comes in response to mounting evidence that banks violated tax requirements by mishandling the transfer of mortgages to REMICs, short for Real Estate Mortgage Conduits.

Should the IRS find reason to take tough action, the financial impact could be enormous. REMIC investments are held by pension funds, in individual retirement plans such as 401(k)s and by state and local government entities.

As of the end of 2010, investments in REMICs totaled more than $3 trillion, according to data supplied by the Securities Industry and Financial Markets Association.

In a brief statement in response to questions from Reuters, the agency said: "The IRS is aware of questions in the market regarding REMICs and proper ownership of the underlying mortgages as set out in federal tax law, and is actively reviewing certain aspects of this issue."

The statement said the IRS would not make any further comment. An IRS spokesman declined to say anything about the extent of the review, or whether the agency is likely to take action.

The review, however, is a sign that the widespread bank misdeeds in home foreclosure cases are spilling over to threaten the interests of investors in mortgage-backed securities. The banks originated the mortgages and packaged them into securities.

These banks' transgressions, confirmed in court decisions and through recent action by federal bank regulators, include the failure to formally transfer ownership of mortgages to the trusts that invested in them and the subsequent creation of fraudulent mortgage assignments and other false documents.

These investment trusts already have suffered big drops in income because of vast numbers of mortgage defaults after the housing boom collapse. They have been hurt too because in an increasing number of instances they have been blocked by courts from foreclosing on defaulted mortgages. The courts ruled that because the trusts never received the required documents establishing that they owned the mortgages, they have no standing to foreclose.

For investors, one of the big attractions of REMICs has been that they aren't "double-taxed." While individual investors pay taxes on income they receive from REMICs, the securities themselves are exempt from business income tax. But if the IRS concludes that the REMIC investments failed to comply with strict requirements in the federal tax code, the REMIC would have to pay a 100 percent tax on the income from those investments.

That means that the IRS could confiscate the full amount. Tax law experts said the REMICs also could be subjected to additional penalties for failing to file tax returns on the income.  See: Scot J. Paltrow, *IRS weighs tax penalties on mortgage securities*, Reuters, April 27, 2011, http://reut.rs/kPqOnE.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION
### PLAINTIFF'S STYLED "MORTGAGE, ASSIGNMENT & NOTE"

201) On or about October 12, 2005, Darrick Grimes and Yolanda P. Grimes, (the "Plaintiffs"), as husband and wife executed a mortgage with a promissory note (the "Note") for $405,000.00 payable to Fremont Investment and Loan (hereinafter "Fremont").

202) This styled Mortgage Note was recorded on December 6, 2005 in the land records of

203) Orange County, New York as Orange County Clerk Recorder Office.

204) On October 12, 2005, Fremont in a deceitful maneuver purposely assigned this mortgage to U.S. Bank, National Association,  as the Trustee for the "MASTR 2006 FRE-1" and

in contravention of New York Trust Laws which governs this alleged Trust. Such transfer is VOID. Any trust formed in 2006 would need to be assigned in 2006 or the latest 2007. Such assignment in 2011 is VOID as matter of law and was fraudulently created for the purpose of foreclosure.

205) Additionally no Corporate Seal is affixed to such document as required by New York Law. An ongoing investigation by Plaintiffs is being undertaken to uncover the extent of such deceitful filing done to enrich such Defendant at the expense of the Plaintiffs.

206) The Pooling and Servicing Agreement requires that such note be endorsed within 30 days after being placed into the "MASTR 2006 FRE-1" Trust. Therefore the endorsement should be acknowledged and endorsed into the name of "U.S. Bank" as Trustee of the [MASTR Asset Backed Securities Trust 2006 FRE-1, under the pooling and servicing agreement dated 2-1-2006]. It is apparent that this Mortgage never made it into the trust and as such is deception on the Plaintiffs.

207) Such document cannot be enforced by the initial receptor and its purported  successors. Enforcement is VOID *ab initio* due to the falsity uttering placed by such agent. "MASTR 2006 FRE-1" is a private mortgage backed security formed under strict compliance NEW YORK TRUST LAWS.

208) "U.S. Bank", represents itself as a "Trustee" of the alleged trust ["MASTR 2006 FRE-1"][although the exact trust has not been confirmed by investigations], is actually a Mortgage Back Security ("MBS") and as "Trustee", holds only "Nominal Legal Title" to represent the trust. No timely or legal assignment to this entity has been done in the land title records to assign the mortgage.

209) Such "MBS" is formed under NEW YORK Trust laws.  Such a Trust functioning under such law provides that any transfer to the trust in contravention of the trust documents is VOID, N. Y. ESTATES, POWERS & TRUST LAWS § 7-2.4 (McKinney 2002).

210) Pursuant to the Trust Agreement which governs ["MASTR 2006 FRE-1"], the "Issuing Entity" was created by the Depositor (Mortgage Asset Securitization Transactions, Inc) and its