UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DARRICK GRIMES and YOLANDA GRIMES, on
behalf of themselves and a class of others similarly
situated,

                          Plaintiffs,

       -v-

FREMONT GENERAL CORPORATION, FREMONT
INVESTMENT AND LOAN, WCS LENDING LLC,
JONATHAN TANENBAUM, NADENE MCBEAN,
AMERICA'S SERVICING COMPANY, U.S.
BANCORP and U.S. BANK, NATIONAL
ASSOCIATION, as Trustee for Master Asset Backed
Securities Trust 2006-FRE-1, "JOHN DOE" and "JANE
DOE," the last two names being fictitious said parties
being individuals, if any, having any involvement in the
fraud perpetrated on Plaintiffs, and XYZ-1
CORPORATION and XYZ-2 CORPORATION, the last
two names being fictitious, it being the intention of
Plaintiffs to designate any corporation or entity having
any involvement in the fraud perpetrated on Plaintiffs
described herein,

                          Defendants.

Case No. 08-CV-1024 (KMK)


OPINION AND ORDER

Appearances:

Darrick Grimes and Yolanda Grimes
Newburgh, New York
*Pro Se Plaintiffs*

Kenneth J. Flickinger, Esq.
Knuckles, Komosinski & Elliot, LLP
Elmsford, New York
*Counsel for Defendants Fremont General Corporation and Fremont Investment and Loan*

Matthew J. Bizzaro, Esq.
Noah Nurnberg, Esq.
L'Abbate, Balkan, Colavita & Conti
Garden City, New York
*Counsel for Defendant WCS Lending, LLC*

Steven M. Hecht, Esq.
Lowenstein Sandler PC
New York, New York
*Counsel for Defendant U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006-FRE-1*

KENNETH M. KARAS, District Judge:

Pro se Plaintiffs Darrick and Yolanda Grimes originally filed this action in 2008 against Fremont General Corporation and Fremont Investment and Loan (collectively "FGC" or "the Fremont Defendants"); WCS Lending LLC ("WCS"); several other identified corporate entities and named individuals; and multiple John/Jane Does and XYZ-Corporations. Plaintiffs asserted a variety of federal and state law claims against Defendants, arising out of Plaintiffs' purchase of a home in Newburgh, New York on October 12, 2005. WCS served as Plaintiffs' mortgage broker for the purchase and helped Plaintiffs secure two loans from the Fremont Defendants.

Plaintiffs are now on their Second Amended Complaint, having twice been granted leave to amend and replead certain causes of action. Defendants WCS and FGC have once again moved to dismiss pursuant to Federal Rules of Civil Procedure 8(a)(2) and 12(b)(6). After reviewing the Parties' submissions, the Court is disappointed to find that Plaintiffs squandered their latest (and last) opportunity to submit a meaningful complaint based on good-faith allegations and viable causes of action. Instead, they filed a legal mirage—an instrument that is superficially plausible but is actually based on incoherent and misleading allegations and vacuous legal claims. The Court accordingly grants Defendants' motions and dismisses the action with prejudice.

2

I. Background

A. Facts

The Court has described the history of this matter in a prior published Opinion and Order. *See Grimes v. Fremont General Corp.*, 785 F. Supp. 2d 269, 276 (S.D.N.Y. 2011).  The Court therefore assumes familiarity with the dispute and will provide only a brief summary of the factual and procedural history as relevant to the instant Motions.

Plaintiffs are African Americans, (Second Am. Compl. ("SAC") ¶ 2), who, in the summer of 2005, purchased a home in Newburgh, New York for $435,000.  *See Grimes*, 785 F. Supp. 2d at 276–77.  Defendant WCS is a licensed mortgage broker that is based in Florida.  (SAC ¶ 2.)  WCS, through an employee, Defendant Joseph Tanenbaum, (*id.*), helped Plaintiffs obtain two loans from FGC, which loans Plaintiff used to purchase the Newburgh home.  *See Grimes*, 785 F. Supp. 2d at 277–79.  Defendant FGC is a financial services holding company that engages in real estate lending through its subsidiary, Defendant Fremont Investment and Loan, a lender that obtains its loans through a network of independent mortgage brokers like WCS, (SAC ¶ 2).  *See Grimes*, 785 F. Supp. 2d at 277.

Documentary evidence attached to Plaintiffs' original complaint—and which is incorporated both directly and by reference into the Second Amended Complaint, (SAC ¶¶ 941–47 (requesting incorporation of previously submitted exhibits))—demonstrates that on September 14, 2005, Plaintiffs received an offer through WCS for a floating, adjustable-rate loan, as opposed to a fixed-rate loan, from FGC to purchase the Newburgh home.  *See id.* at 278 ("Plaintiffs admit that they signed [a mortgage application and disclosure documents from WCS for a potential Fremont Loan] . . . [which] clearly and repeatedly stated that the loan was not a

3

fixed rate, but instead was a 2/28 ARM mortgage.").[1]  Indeed, these documents, which Plaintiffs

admitted to signing, describe the terms of the loan and expressly note that Plaintiffs' "interest

rate was . . . floating and was subject to daily changes based upon market fluctuations."  *Id.*

(brackets and internal quotation marks omitted).  Plaintiffs previously admitted to the Court,

both in the First Amended Complaint and during oral argument, that from September 14, 2005

through the closing on October 12, 2005, they were in contact with FGC and WCS, as well as

their attorney, regarding FGC's loan offer, (First Am. Compl. ¶ 187).  *See Grimes*, 785 F. Supp.

2d at 279.[2]  And at the closing, Plaintiffs accepted two loans from FGC—one of which was an

---

[1] In the First Amended Complaint, Plaintiffs admitted to signing these "confusing" documents on September 20, 2005.  (First Am. Compl. ¶¶ 69–71.)  In the Second Amended Complaint, Plaintiffs' allegations regarding various loan documents are very difficult to follow.  So far as the Court can tell, however, Plaintiffs neither expressly state nor deny that they signed the September 14 documents.  Instead, as will be discussed at greater length below, they claim that these and other documents were "merely a diversion to perpetrate . . . fraud[] on the Plaintiffs . . . and did not accurately reflect the fees and loan terms that WCS Lending . . . and Fremont . . . knew about."  (SAC ¶ 947.)  They claim that the real terms of the loan were memorialized in documents which were surreptitiously prepared by WCS and FGC on September 13 and 14, approved on September 16, and fraudulently kept from Plaintiffs until October 11 or 12, 2005.  (*Id.* ¶¶ 945–46.)

For the purposes of the instant Motions to Dismiss, the Court may consider the fact that Plaintiffs signed the September 14 loan application and disclosure documents, both of which indicated that Plaintiffs were receiving a floating-, rather than fixed-, rate loan.  As noted, Plaintiffs incorporated the September 14 documents into the Second Amended Complaint.  Furthermore, Plaintiffs may not directly contradict their previous allegations—regarding the September 14 documents or any other aspects of the loan origination and closing—for strategic benefit.  *See United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) ("A party thus cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories."); *Kilkenny v. Law Office of Cushner & Garvey, L.L.P.*, No. 08-CV-0588, 2012 WL 1638326, at *5 (S.D.N.Y. May 8, 2012) (collecting authority for the proposition that "a court may disregard amended pleadings when they directly contradict facts that have been alleged in prior pleadings").

[2] There is no allegation in the Second Amended Complaint, one way or the other, regarding whether Plaintiffs were represented by counsel.  The fact that Plaintiffs were represented by counsel is not dispositive with respect to any of Plaintiffs' claims.

adjustable-rate mortgage, the other of which was fixed rate—and purchased the home.

"Plaintiffs stopped making payments on their first mortgage in September 2006. On December 26, 2006, U.S. Bank[,] [the trustee and custodian of a trust holding Plaintiffs' securitized mortgage,] filed a foreclosure action against Plaintiffs in the Supreme Court of the State of New York, County of Orange County." *Id.* at 280–81 (citation omitted). That proceeding is on hold, pending this litigation. *Id.* at 281, n.17. Plaintiffs have thus been living in the Newburgh home without making a mortgage payment since 2006. *See id.*

B. Procedural History

Plaintiffs originally brought this action on January 31, 2008 before the Honorable Judge John G. Koetl. (Dkt. No. 1.) Pursuant to an order of Judge Koetl, (Dkt. No. 47), Plaintiffs filed an Amended Complaint on December 12, 2008, (Dkt. No. 48). The matter was then referred to the undersigned. (Dkt. No. 89.) The Amended Complaint was "161 pages long and contain[ed] 722 paragraphs. It sometimes contain[ed] conflicting dates and descriptions of events, and Plaintiffs [were] not always clear about which Defendants purportedly took which actions." *Grimes*, 785 F. Supp. 2d at 276. Defendants WCS, FGC, and U.S. Bank moved to dismiss the Amended Complaint, and on March 31, 2011, the Court granted their motions in part:

> The motions to dismiss of Fremont, WCS, and U.S. Bank are granted in part. . . . Plaintiffs' TILA, HOEPA, RESPA, FHA, ECOA, and Civil RICO claims are dismissed *with prejudice* as to all Moving Defendants. However, given Plaintiffs' pro se status, the Court will allow Plaintiffs to amend their Civil Rights Act claims to attempt to cure the deficiencies in the Amended Complaint as to Fremont and WCS. Therefore, Plaintiffs' Civil Rights Act claims are dismissed without prejudice as to Fremont and WCS, but *with prejudice* as to U.S. Bank. . . . The Moving Defendants' motions to dismiss Plaintiffs' state law claims are denied without prejudice to renewal at a later date[, if Plaintiffs amend to adequately plead a federal cause of action].

*Id.* at 302–03 (emphasis added).

5

Plaintiffs filed their Second Amended Complaint on October 3, 2011.  (Dkt. No. 138.)  In disregard of the Court's instructions in its March 31, 2011 Opinion and Order, the Second Amended Complaint is 341 pages in length (over twice the length of the First Amended Complaint), contains 1,215 numbered paragraphs (many of which contain un-numbered subparagraphs), and carries 237 pages of attachments.  Furthermore, in addition to repleading the Civil Rights Act claims, Plaintiffs attempted to reassert several of the dismissed causes of action, asserted dozens of new claims, and seem to have identified several new Defendants—all without seeking or receiving Defendants' or the Court's permission to amend in this matter.[3]

To make matters worse, and as the Court will explain at greater length below, hundreds of paragraphs in the Second Amended Complaint have been copied and pasted virtually verbatim, without citation or explanation, from complaints in separate court proceedings— complaints which were, for the most part, filed by other plaintiffs against parties entirely unrelated to the instant litigation.  And the Court uses the phrase "virtually verbatim," because Plaintiffs *did* deem it appropriate to alter the lifted language by substituting in party names, locations, and other relevant proper nouns in an apparent effort to make the allegations in these other, unrelated actions appear to be applicable here and to survive potential motions to dismiss.

Defendants requested a premotion conference in late 2011, seeking to file motions to dismiss the Second Amended Complaint.  On January 30, 2012, the Court held the conference, during which Plaintiffs conceded that they did not have a viable cause of action against

---

[3] For example, Plaintiffs make allegations suggesting their intent to bring causes of action against Rosicki, Rosicki, and Associates, P.C. in conjunction with Plaintiffs' claims against U.S. Bank.  (SAC ¶ 109 (stating that "Rosicki, Rosicki & Associates, P.C., and their employees, agents and servants" engaged in a "civil conspiracy" with U.S. Bank "to deprive the Plaintiffs of their property").)

Defendant U.S. Bank, and admitted that they were merely asserting potential defenses that might

bear on the state court foreclosure proceeding.  At the Court's suggestion, Plaintiffs and

Defendant U.S. Bank attempted to reach a stipulation, dismissing Plaintiffs' claims against U.S.

Bank here, but preserving those claims as defenses in the foreclosure proceeding.  (Dkt. No.

147.)  The Parties could not reach an agreement, however, and the Court accordingly dismissed

all of Plaintiffs' claims against U.S. Bank with prejudice on February 28, 2012.[4]  (Dkt. No. 148.)

Also at the January 30, 2012 premotion conference, the Court pressed Plaintiffs to articulate a

theory of their claims based on 42 U.S.C. §§ 1981 and 1982 ("the Civil Rights Act claims") as to

Defendant WCS.  After an extended dialogue, the Court asked Plaintiffs: "What factual

allegation have you made that WCS did anything towards you and your wife because of your

race? . . . [D]o you have [such] an allegation?"  Plaintiff responded:  "Not at this moment, your

Honor."  (Decl. of Matthew J. Bizzaro Ex. 4, at 15–16.)

Now before the Court are WCS's and FGC's Motions to Dismiss pursuant to Federal

Rules of Procedure 8(a)(2) and 12(b)(6).

## II. Discussion

A. Submissions by Pro Se Litigants

Courts must construe submissions by pro se litigants "liberally . . . to raise the strongest

arguments that they suggest. " *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir.

2006).  "Although pro se litigants must be afforded a certain amount of latitude, they are still

required to attempt to comply with procedural rules, especially when they can be understood

---

[4] For the same reason, to the extent that Plaintiffs attempted to assert claims against
Rosicki, Rosicki, and Associates, P.C. in the Second Amended Complaint, those claims too are
hereby dismissed with prejudice.

without legal training and experience." *Yadav v. Brookhaven Nat'l Lab.*, 487 F. App'x 671, 672 (2d Cir. 2012); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (internal quotation marks omitted)).   The expectation that pro se litigants comply with procedural rules is especially reasonable here, where Plaintiffs are not unfamiliar with the law; they are, or were, legal assistants at a major law firm and have at various times relevant to this proceeding been represented by counsel. *See Grimes*, 785 F. Supp. 2d at 276.   Plaintiffs are also specifically bound by Federal Rule of Civil Procedure 11, which sets forth that "[b]y presenting to the court a pleading[,] . . . an . . . unrepresented party certifies that to the best of the person's knowledge, information, and belief . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."   Fed. R. Civ. P. 11(b)(3).

B. Rule 8(a)(2)

Federal Rule of Civil Procedure 8 establishes the standard for pleadings.   According to Rule 8(a)(2), a prayer for relief "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."   On the one hand, this "pleading standard . . . does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).   On the other hand, "[t]he pleading of additional evidence, beyond what is required to enable the defendant to respond, is not only unnecessary, but in contravention of proper pleading procedure." *Roth v. Jennings*, 489 F.3d 499, 512 (2d Cir. 2007) (alteration in original) (internal quotation marks omitted).   "When a complaint does not comply with Rule 8," by virtue of a plaintiff's including redundant or unnecessary allegations, "the court may dismiss

the complaint or strike those portions that are redundant or immaterial." *Foreman v. Comm.*

*Goord*, No. 02-CV-7089, 2004 WL 385114, at *4 (S.D.N.Y. Mar. 2, 2004). Such dismissal is

generally "disfavored": "Dismissal for failure to comply with Rule 8 . . . is 'usually reserved for

those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible

that its true substance, if any, is well disguised.'" *Id.* (quoting *Salahuddin v. Cuomo*, 861 F.2d

40, 42 (2d Cir. 1988)).

   This is one of the exceptional cases.

   The Second Amended Complaint is over 300 pages long and contains over 1000

specifically numbered paragraphs and hundreds of additional un-numbered paragraphs.  Some

paragraphs are single spaced; others, double spaced.  Courts have dismissed complaints that are

far shorter and far clearer pursuant to Federal Rule 8(a)(2).  *See Salahuddin*, 861 F.2d at 43

(explaining that there was "no doubt that [the plaintiff's] complaint fail[ed] to comply with Rule

8's 'short and plain statement' requirement," because the complaint spanned "15 single-spaced

pages and contain[ed] explicit descriptions of 20-odd defendants, their official positions, and

their roles in the alleged denials of [plaintiff's] rights"); *Martin Luther King Jr., H.S. Parents v.*

*N.Y.C. Dep't of Educ.*, No. 02-CV-1689, 2004 WL 1656598, at *2 (S.D.N.Y. July 23, 2004)

(dismissing complaint that ran "nearly 60 pages and comprise[d] 597 numbered paragraphs,

many containing sub-paragraphs, and still more unnumbered paragraphs"), *aff'd in relevant part*

*but vacated in part by Blakely v. Wells*, 209 F. App'x 18 (2d Cir. 2006) ("The District Court

acted within the bounds of permissible discretion in dismissing the second amended complaint

for noncompliance with Rule 8(a).  The pleading, which spanned 57 pages and contained 597

numbered paragraphs, was far from short or plain."); *Gonzales v. Wing*, 167 F.R.D. 352, 354

(N.D.N.Y. 1996) (dismissing "plaintiffs' two hundred and eighty-seven page [c]omplaint" which

contained "so many factual averments of such specificity that it [was] impossible to discern which facts support, or are even relevant to, which claims," and in which "plaintiffs . . . made no attempt to number their numberless paragraph[s]"); *cf. Turner v. Smith*, No. 11-CV-5176, 2012 WL 6019103, at *1–2 (N.D. Cal. Dec. 3, 2012) (declining to dismiss a "160-page [Second Amended Complaint] with 168 paragraphs alleging 47 causes of action against thirteen named defendants and five Doe Defendants" and which appended "50 pages of exhibits" because the complaint was otherwise "intelligible, logically structured, and organized").

Moreover, although Plaintiffs' causes of action are separately asserted, the Second Amended Complaint as a whole is disjointed and unorganized, and literally hundreds of paragraphs are irrelevant (or relevant only to claims that have already been dismissed with prejudice), repetitive, and/or contradictory.  This is hardly surprising; to create this massive pleading, Plaintiffs apparently surfed the Internet for similar—or, not so similar—complaints against other mortgage brokers and lending institutions and block–copied and pasted swaths of paragraphs, making minor but misleading edits.  Therefore, to determine whether the Second Amended Complaint survives Defendants' 12(b)(6) motions, Defendants would have to parse the document to find allegations that are specific to this action, and to do so would impose a tremendous cost in terms of time and the administration of justice.  *See Salahuddin*, 861 F.2d at 42 ("The statement should be short because unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." (brackets and internal quotation marks omitted)).

Finally, given the circumstances, the Court dismisses the Second Amended Complaint with prejudice.  To be sure, Plaintiffs' pro se status augurs against such a harsh result.  *See*

*Salahuddin*, 861 F.2d at 42("[I]t will generally be an abuse of discretion to deny leave to amend when dismissing a nonfrivolous original complaint on the sole ground that it does not constitute the short and plain statement required by Rule 8."); *Owens v. N.Y.C. Dep't of Sanitation*, No. 11-CV-8297, 2013 WL 150245, at *3 (S.D.N.Y. Jan. 15, 2013) (noting that, in general, "a court should grant leave to amend [to a pro se litigant] at least once before dismissing [a complaint] with prejudice"); *Ogunbayo v. Montego Med. Consulting*, Nos. 11-CV-4047, 12-CV-0428, 2012 WL 6625921, at *7 (E.D.N.Y. Dec. 19, 2012) (adopting magistrate judge's recommendation that "[p]laintiff, proceeding pro se, should be afforded an opportunity to amend the [dismissed] [c]omplaint").  But Plaintiffs have twice already been granted leave to amend their complaint. (Dkt. Nos. 47, 131.)  Even pro se litigants are generally not entitled to further amendment.  *Cf. Breer v. Maranville*, No. 12-CV-0053, 2012 WL 6597707, at *3 (D. Vt. Nov. 27, 2012) ("The Second Circuit has cautioned that district courts should not dismiss pro se complaints with prejudice without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."); *Bratton v. Fitzpatrick*, No. 12-CV-0204, 2012 WL 4754558, at *2 & n.2 (N.D.N.Y. Oct. 4, 2012) (citing authority for the proposition that "granting a pro se civil rights plaintiff an opportunity to amend his or her pleading before dismissing that pleading for failure to state a claim[] [is] not required where, as here, the plaintiff has already been afforded the opportunity to amend his or her pleading").

Additionally, this complaint, Plaintiffs' third effort, is nowhere near the vicinity of a viable, clear complaint.  Indeed, given the substantial portions of the Second Amended Complaint that have been lifted and disguised, this complaint represents a significant step in the wrong direction.  *Cf. Vann v. Comm'r of N.Y.C. Dep't of Corr.*, 11-PR-2200, 2012 WL 4010492, at *3 (2d Cir. Sept. 13, 2012) (affirming dismissal with prejudice given "the falsity of

11

[plaintiff's] application [for *in forma puaperis* status] and his [supporting] declarations," as well

as his "bad faith in th[e] case as evidenced by his litigation experience . . . and [his] failure to

credibly explain or correct" deficiencies in submissions "when given an opportunity to do so").

In the Court's view, further amendment would be futile, and dismissal with prejudice is therefore

appropriate. *See Dyson v. N.Y. Health Care, Inc.*, 353 F. App'x 502 (2d Cir. 2009) (noting that

"the district court did not abuse its discretion by dismissing [plaintiff's] third amended complaint

with prejudice," where plaintiff had been afforded multiple opportunities to file an amended

complaint, and where plaintiff ignored specific instructions from the court); *Beer*, 2012 WL

6597707, at *3 ("[L]eave to amend may be denied when an amendment would be futile.").[5]

---

[5] In its March 31, 2011 Opinion and Order, the Court granted Plaintiffs permission to replead only their Civil Rights Act claims. *See Grimes*, 785 F. Supp. 2d at 303. Plaintiffs did not seek or receive permission, pursuant to Federal Rule of Civil Procedure 15, to amend their complaint further. Consequently, independent of its decisions to dismiss the entirety of the Second Amended Complaint pursuant to Rule 8(a)(2), the Court also dismisses each of the new causes of action in the Second Amended Complaint with prejudice. *See Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012) ("District courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted."); *Pagan v. N.Y. State Div. of Parole*, No. 98-CV-5840, 2002 WL 398682, at *3 (S.D.N.Y. Mar. 13, 2002) (dismissing plaintiff's "three new state law claims" because he had received permission to replead "only his employment discrimination claims under Title VII, Section 1981, and the Human Rights Law"); *Willet v. City Univ. of N.Y.*, No. 94-CV-3873, 1997 WL 104769, at *2 (E.D.N.Y. Feb. 18, 1997) (refusing to consider "plaintiff's second, fourth, fifth, seventh, and eighth claims" because plaintiff had been granted leave to amend only his other claims); *accord Concerned Citizens for a Safe Cmty. v. Office of Fed. Detention Trustee*, No. 09-CV-1409, 2011 WL 2971000, at *2 (D. Nev. July 19, 2011) (striking plaintiffs' new "claim, . . . new prayer for relief, and two new defendants," where the court had granted "leave to amend for the limited purpose of curing . . . standing deficiencies").

Additionally, in their three memoranda of law in response to Defendants' motions, Plaintiffs offer new factual allegations—or replead allegations that were in the First Amended Complaint but not in the Second Amended Complaint. (Pls.' Mem. of Law in Opp'n to Def. WCS Lending's Mot. To Dismiss ("Pls.' Second Mem.") 7–19 (Dkt. No. 161).) Moreover, apparently dissatisfied with the twenty-seven causes of action in the Second Amended Complaint, Plaintiffs also assert *even more* new causes of action in their memoranda of law, such as tortious interference with contractual relations, (Pls.' Mem. of Law in Opp'n to Def.

C. Rule 12(b)(6)

1. Standard of Review

In considering Defendants' motions to dismiss, the Court is required to construe the

factual allegations contained in the Second Amended Complaint as true.  *See Ruotolo v. City of*

*New York*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review *de novo* a district court's dismissal of a

complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and

drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted));

*Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008) (same).  Moreover, "[i]n

adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated

on the face of the complaint, in documents appended to the complaint or incorporated in the

complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v.*

*Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6)

motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide

the 'grounds' of his [or her] 'entitle[ment] to relief' requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007) (third alteration in original) (citations omitted).  Instead, the

Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above

the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported

---

Fremont's Mot. To Dismiss 19 (Dkt. No. 160)), and claims based on New York's General
Business Law § 349, (Pls.' Second Mem. 34–38.).  Because motion papers cannot be used to
amend a complaint, the Court ignores these factual allegations and hereby dismisses the new
causes of action.  *See Ifill v. N.Y. State Court Officers Ass'n*, 655 F. Supp. 2d 382, 393 (S.D.N.Y.
2009) (explaining that a complaint may not be amended by making new claims in motion
papers).

by showing any set of facts consistent with the allegations in the complaint," *id.* at 563.

Plaintiffs must allege "only enough facts to state a claim to relief that is plausible on its face."

*Id.* at 570.  But if a plaintiff has "not nudged [his or her] claims across the line from conceivable

to plausible, the[] complaint must be dismissed."  *Id.*; *see also Iqbal*, 556 U.S. at 679

("Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense.  But where the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P.

8(a)(2))).

### 2. Civil Rights Act Claims

In their First Amended Complaint, Plaintiffs asserted claims based on Defendants'

alleged violations of 42 U.S.C. §§ 1981, 1982, and 1985(3).  *See Grimes*, 785 F. Supp. 2d at

295–96.  The Court held that Plaintiffs had failed to plead specific factual allegations in support

of these claims, *see id.* at 296–98, but, because the claims were not time barred, the Court

dismissed them without prejudice and instructed Plaintiff to replead these specific claims, *see id.*

at 298, 303.  In the Second Amended Complaint, Plaintiffs again assert claims pursuant to 42

U.S.C. §§ 1981 and 1982.

The Court previously set forth the tests for Plaintiffs' §§ 1981 and 1982 claims:

 "To establish a claim under § 1981, a plaintiff must allege facts in support of the
following elements: (1) the plaintiff is a member of a racial minority; (2) an intent
to discriminate on the basis of race by the defendant; and (3) the discrimination
concerned one or more of the activities enumerated in the statute (i.e., make and
enforce contracts . . . .)." [*Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7
F.3d 1085, 1087 (2d Cir.1993) (per curiam).]  Similarly, "[t]o maintain an action
under § 1982, a plaintiff must allege that she was [intentionally] deprived of a

14

property right because of her race." *Harary v. Allstate Ins. Co.*, 983 F. Supp. 95, 99 (E.D.N.Y. 1997); *see also Puglisi v. Underhill Park Taxpayer Ass'n*, 947 F. Supp. 673, 700 (S.D.N.Y.1996) (noting that a § 1982 plaintiff must allege facts demonstrating, inter alia, that "the discrimination concerned one or more activities enumerated in [§ 1982] such as ... the purchase and lease of property"). "In order to survive a motion to dismiss, the events of the intentional and purposeful discrimination, as well as the racial animus constituting the motivating factor for the defendant's actions must be specifically pleaded in the complaint." *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 338 (S.D.N.Y. 1999) (internal quotation marks omitted); *see also Sanders v. Grenadier Realty, Inc.*, 367 Fed. App'x. 173, 175 (2d Cir. 2010) (summary order) (upholding district court's dismissal of § 1982 claim where "plaintiffs [did] not allege any facts supporting an inference of racial animus"). Thus, "[f]act-specific allegations of a causal link between the defendant's actions and the plaintiff's race are required," and "[c]onclusory or naked allegations will not suffice." *Dove*, 56 F. Supp. 2d at 338; *see also Dickerson v. State Farm Fire & Cas. Co.*, No. 95-CV-10733, 1996 WL 445076, at *3 (S.D.N.Y. Aug. 1, 1996) ("It is not enough merely to assert that the defendant took adverse action against the plaintiff, and that the action was the product of racial animus. The complaint must allege specific facts supporting both the existence of the racial animus and the inference of a link between the adverse treatment and the racial animus.").

*Grimes*, 785 F. Supp. 2d at 295–96 (first and third through eighth alterations in original).

Plaintiffs clearly have not met this burden with respect to Defendant WCS. First, Plaintiffs have failed to tie their allegations regarding FGC's lending practices to WCS. As a mortgage broker, Defendant WCS submitted a loan application from Plaintiffs to FGC. WCS did not set the terms of the loan; FGC did. Plaintiffs broadly assert that WCS, FGC, and the other named Defendants were engaged in a joint conspiracy and acted as each other's agents. (SAC ¶¶ 2, 11.) Such conclusory assertions are insufficient to survive a motion to dismiss. *See Wightman-Cervantes v. ACLU*, No. 06-CV-4708, 2007 WL 1805483, at *1 (S.D.N.Y. June 25, 2007) (noting that to survive a motion to dismiss, even "a pro se plaintiff must support his [or her] claims with 'specific and detailed factual allegations, not stated in wholly conclusory terms'" (quoting *Friedl v. City of New York*, 210 F.3d 79, 85–86 (2d Cir. 2000)). And Plaintiffs have failed to plead any factual basis for their theory that WCS "induc[ed]" or steered African-

15

American clients to subprime real estate lenders such as FGC, (SAC ¶ 69)—let alone that WCS did so with racial animus.  Nor have they pointed to any other indicia of an agency relationship between WCS and FGC.  *See Whitley v. Taylor Bean &Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885, 895–96 (N.D. Ill. 2009) (explaining that to establish "an agency relationship" between a lender and mortgage broker, "a plaintiff must allege a factual predicate" such as "a written contract"; shared "granting policies, rate sheets, product sheets, loan pricing software, closing documents and training materials"; and/or a compensation scheme, such as "'kickback' payments"); *Taylor v. Accredited Home Lenders, Inc.*, 580 F. Supp. 2d 1062, 1070 (S.D. Cal. 2008) (finding that a lender and broker were in an "agency relationship" because plaintiffs had "allege[d] facts supporting" that theory including a shared compensation scheme and contractual arrangements).  Second, Plaintiffs have failed to identify any other conduct that WCS engaged in that was motivated by racial animus.  Indeed, as noted above, Plaintiffs admitted during the January 30, 2012 premotion conference that they do not have a viable Civil Rights Act claim against WCS.

On the surface, Plaintiffs come closer to the mark with respect to the Fremont Defendants.  (SAC ¶ 9 ("Fremont's subprime account executives held derogatory stereotypes of African Americans, which contributed to their targeting of African Americans in and around the United States and in New York City, particularly in Queens County for subprime loans.").)[6]  But even if the allegations in the Second Amended Complaint would otherwise be sufficient to state a claim under 42 U.S.C. §§ 1981 or 1982 against FGC, these allegations lack any plausible factual basis.  The Second Amended Complaints' facial characteristics—the font, the spacing,

---

[6] Plaintiffs were living in Queens County prior to purchasing the Newburgh home.  *See Grimes*, 785 F. Supp. 2d at 276.

and stylistic inconsistencies, such as footnote call numbers with no footnotes—led the Court to

suspect that Plaintiffs had block–copied and pasted paragraphs from other complaints and court

documents into their complaint.  A few Internet searches confirmed that suspicion.[7]

Such copying is pervasive throughout the Second Amended Complaint, and virtually

every factual allegation relevant to Plaintiffs' Civil Rights Act claim against FGC has been lifted

from another complaint and edited for relevance.  For example, in their discussion of FGC's

practices, Plaintiffs allege:

> A closer look at *Fremont's* lending practices and the characteristics of its loans in
> *Queens County* [New York] by geographical location by zip codes demonstrates
> that it is engaged in a pattern or practice of reverse redlining with respect to the
> *New York City's* African American neighborhoods. . . . [S]worn statements of
> former *Fremont* employees and examination of *Freemont's* loans indicate it is
> engaged in unfair and discriminatory practices in *Queens'* African-American
> neighborhoods that have the effect and purpose of placing inexperienced and
> undeserved borrowers in loans they cannot afford.

(SAC ¶ 506 (emphasis added).)  Nearly identical language can be found in a complaint filed in

2010 by the Mayor and City Council of Baltimore before the United States District Court for the

District of Baltimore:

> A closer look at *Wells Fargo's* lending practices and the characteristics of its
> loans in *Baltimore* by geographical location by zip codes demonstrates that it is

---

[7] District courts possess the inherent power to pierce the veil of a complaint to determine
if it is without factual basis.  *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362,
364 (2d Cir. 2000) (per curiam) (noting that district court possess the inherent power to "dismiss
a frivolous complaint sua sponte even when the plaintiff has paid the required filing fee, just as
the Court of Appeals may dismiss frivolous matters in like circumstances" (italics omitted)); *see
also Smith v. Kelly*, No. 12-CV-2319, 2012 WL 1898944, at *1 (E.D.N.Y. May 24, 2012) ("An
action is frivolous when," among other things "the factual contentions are clearly baseless"
(internal quotation marks omitted)).  Furthermore, on a motion to dismiss, a district court may
take judicial notice of court documents from other proceedings.  *See Coleman v. Blanchette*, No.
11-CV-1632, 2012 WL 3822022, at *4 (D. Conn. Sept. 4, 2012) (noting that a court may take
notice of "other judicial documents," for example where such documents "might provide the
basis for claim preclusion or issue preclusion").

> engaged in a pattern or practice of reverse redlining with respect to the *City's* African American neighborhoods. . . . [S]worn statements of former *Wells Fargo* employees and examination of *Wells Fargo's* loans indicate it is engaged in unfair and discriminatory practices in *Baltimore's* African-American neighborhoods that have the effect and purpose of placing inexperienced and undeserved borrowers in loans they cannot afford.

(Second Am. Compl. ¶ 45 (08-CV-0062 Dkt. (D. Md.)) (emphasis added).  *Compare* SAC ¶¶ 489–534, *with* Second Am. Compl. ¶¶ 28–92 (08-CV-0062 Dkt. (D. Md.)).)[8]

Similarly, Plaintiffs allege:

> *Fremont* produced and distributed to its employees, account executives, and mortgage brokers written marketing and educational materials explaining that the limited choices available to Black and Latino borrowers made them good candidates for *Fremont's* subprime loan products and that loan originators should focus on the "emerging markets" of Black and Latino homebuyers.

(SAC ¶ 555 (emphasis added).)  This language originally appeared in a complaint filed by Massachusetts against, inter alia, H&R Block:

> [H&R Block] Entities produced and distributed to its employees, account executives, and mortgage brokers written marketing and educational materials explaining that the limited choices available to Black and Latino borrowers made them good candidates for [H&R Block] Entities' subprime loan products and that loan originators should focus on the "emerging markets" of Black and Latino homebuyers.

(Compl. ¶ 120 (08-CV-2474 (Mass. Sup. Ct.)).  *Compare* SAC ¶¶ 553–565, *with* Compl. ¶¶ 118–131 (08-CV-2474 (Mass. Sup. Ct.)).)[9]

---

[8] It is unsurprising that Plaintiffs found this paragraph attractive, given this Court's recommendation that "[i]f Plaintiffs choose to amend, they should add [statistics allegedly demonstrating that Fremont targeted residents in Plaintiffs' zip code, which is predominantly African-American] and other *specific* non-conclusory allegations, to the extent they exist." *Grimes*, 785 F. Supp. 2d at 298 n.42 (emphasis added).  The Court assumed it was clear that Plaintiffs were to research and plead statistics *actually* specific to this dispute, as opposed to statistics that could be *edited to seem* specific to this dispute.

[9] Although further examples may seem gratuitous, Plaintiffs also lifted allegations relevant to their Civil Rights Act claim from a complaint against Bank of America filed in the

At no point do Plaintiffs cite the original documents, nor do they justify their copying and pasting by explaining their knowledge or basis to believe that the borrowed allegations from other complaints, unique to other defendants in other locations, are true as to Defendants here.

The fact that so many of Plaintiffs' factual allegations are copied from pleadings in unrelated cases is an independent basis for the Court to dismiss Plaintiffs' Civil Rights Act claims. *See Triano v. Town of Harrison*, No. 09-CV-6319, 2012 WL 4474163, at * (S.D.N.Y. Sept. 26, 2012) (noting, in dismissing plaintiff's *Monell* claim, that plaintiff's allegations were "troubling," because plaintiff had "copied [a] list of 'systematic flaws' in his Amended Complaint—which he claim[ed] support[ed] the existence of a municipal custom of tolerating and covering up police abuse—almost verbatim from the allegations made by another plaintiff" in a case in which the *Monell* claim had survived a motion to dismiss); *Piccone v. Town of Webster*, No. 09-CV-6266, 2011 WL 3322550, at *22 (W.D.N.Y. Aug. 2, 2011) (dismissing *Monell* claim where, inter alia, plaintiff's factual allegations were not only "vague and unsubstantiated" but also "largely . . . ha[d] [nothing] to do with the case at bar and seem[ed] to have been copied from a pleading in a different case"); *Campbell v. Giuliani*, No. 99-CV-2603, 2000 WL 194815, at *5 (E.D.N.Y. Feb. 16, 2000) (dismissing claim because, among other things, plaintiff had "simply cribbed [a] paragraph from another complaint entirely—and counsel admitted as much at oral argument"). A district court for the District of Maryland confronted a complaint similar to the instant one, in which the plaintiff had "cribbed long passages from [another] complaint" but had copied only "general allegations of wrongdoing"—rather than "allegations regarding specific [conduct]." *United States ex rel. Brooks v. Lockheed Martin*

Superior Court for Los Angeles County.  (*Compare* SAC ¶¶ 583–596, *with* Third Am. Compl. ("*Ronald* Compl.") ¶¶ 6–13 (BC40944 (Sup. Ct. L.A. Cnty.).)

19

*Corp.*, 423 F. Supp. 2d 522, 527–28 (D. Md. 2006).  The court explained that by relying on the

prior complaint and failing to identify specific wrongful conduct, plaintiff had implicitly

admitted that he "kn[ew] of none."  *Id.*  Plaintiffs here were more enterprising.  Rather than just

copying general allegations, they also copied specific allegations and deceptively edited them.

But the resulting inference is the same:  Plaintiffs cannot point to any conduct that FGC engaged

in that supports *their* Civil Rights Act claims.[10]

Finally, insofar as Plaintiffs' §1981 and §1982 claims are concerned, in its March 31,

2011 Opinion and Order, the Court offered several guideposts for how Plaintiffs should replead

these claims to make them viable.  For example, the Court explained that Plaintiffs' allegations

in the First Amended Complaint regarding FGC's and WCS's racial targeting were deficient

because Plaintiffs had failed to explain "how this targeting was conducted" and had failed to

"provid[e] examples."  *Grimes*, 785 F. Supp. 2d at 296.  The Court further explained that in their

First Amended Complaint, Plaintiffs had not "specifically alleged that Defendants took these

purportedly discriminatory actions, or intended to take these actions, because Plaintiffs were

African–American.  Nor [had] Plaintiffs provided any facts in support of their contention that

intentional discrimination occurred."  *Id.*  Plaintiffs offer nothing new in the Second Amended

Complaint to cure these deficiencies.  As the Court has already explained, Plaintiffs' allegations

---

[10] In light of Plaintiffs' failure to plead any allegations based on their knowledge or good-faith belief in support of their Civil Rights Act claim, the Court dismisses this claim without addressing the Fremont Defendants' argument that Plaintiffs' Civil Rights Act claims are barred by the doctrine of res judicata.  (Mem. of Law in Supp. of [FGC's] Mot. To Dismiss 7–8 (Dkt. No. 157).)  Nor does the Court address FGC's other answers to Plaintiffs' Civil Rights Act claim: that Plaintiffs' statistical data do not support the claim; that other race-neutral considerations explain these data; that Plaintiffs' allegations regarding race-specific promotional materials do not support their claim; and that Fremont did not know that Plaintiffs were African Americans when they applied for the loan.

that actually describe other lending institutions' practices in other cities do not "nudge[] [their] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  And Plaintiffs offer nothing new in their Second Amended Complaint that is specific to their experiences with FGC and WCS.  These claims are thus dismissed.

Without the Court's permission, Plaintiffs also assert a new cause of action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated the Equal Protection Clause.[11]  This claim is spurious and dismissed with prejudice.  First, it is time barred.  "The statute of limitations for claims brought under Section 1983 is governed by state law," and in New York "is the three-year period for personal injury actions."  *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009); *see also Hicks v. Moore*, No. 12-CV-0398, 2013 WL 765081, at *1 (2d Cir. March 1, 2013) (summary order) (same).  The limitations period started running in 2005, *see Grimes*, 785 F. Supp. 2d at 290 (explaining, in the context of Plaintiffs' Fair Housing Act claim, that "Plaintiffs' claim that Defendants intentionally provided them with an unfair loan because of their race is based on conduct that, with respect to Plaintiffs, undoubtedly concluded with the close of the transaction on October 12, 2005"), and neither equitable tolling nor the continuing violation doctrine is available to Plaintiffs for this cause of action, *see id.* at 291–92, 294–95.  Second, a § 1983 claim may be asserted against only parties operating "under the color of law"—i.e., state actors.  *See, e.g.*, *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 273 (2d Cir. 1999) ("Section 1983 [imposes civil liability] . . . only on those who act under color

---

[11] Plaintiffs appear no longer to pursue their 42 U.S.C. § 1985(3) claim.  In any event, such a claim would fail for the same reasons that Plaintiffs' §§ 1981 and 1982 claims fail: Plaintiffs have not pled good-faith factual allegations that demonstrate Defendants' racial animus.  *See Grimes*, 785 F. Supp. 2d at 298 (citing authority for the proposition that, to make out a § 1985(3) claim, a plaintiff must allege a conspiracy "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action").

of law."); *John v. Campbell Oil Co., Inc.*, No. 85-CV-0842, 1986 WL 5933, at *1 (W.D.N.Y.

May 22, 1986) (noting that "claims asserted under 42 U.S.C. §§ 1981, 1982 and

1985(3) . . . [u]nlike section 1983 [claims] . . . do not require state action and are valid claims as

against private parties"). Both moving Defendants are private parties, and Plaintiffs make no

allegations that they were acting under color of law.

In sum, Plaintiffs' Civil Rights Act claims are dismissed with prejudice.[12]

3. State Law Claims

a. Jurisdiction

The remaining claims in the Second Amended Complaint are state law claims. In its

March 31, 2011 Opinion and Order, the Court did not evaluate these claims on the merits,

declining to assert supplemental jurisdiction over them, because Plaintiffs had failed to plead a

viable federal claim. *See Grimes*, 785 F. Supp. 2d at 302–03. Here too, the Court holds that

Plaintiffs have failed to state a federal claim. Now, however, the equities augur in favor of

assuming supplemental jurisdiction over Plaintiffs' state law claims.[13]

---

[12] The Court has already explained why further amendment would be futile.

[13] There has been some discussion between the Court and the Parties as to whether the Court has diversity jurisdiction over Plaintiffs' state law claims. *See* 28 U.S.C. § 1332. But "[d]iversity jurisdiction requires that 'all adverse parties to a litigation [be] completely diverse in their citizenships.'" *Techno-TM, LLC v. Fireaway, Inc.*, No. 12-CV-4137, 2013 WL 639150, at *1 (S.D.N.Y. Feb. 21, 2013) (quoting *Herrick Co. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322 (2d Cir. 2001)). Plaintiffs failed to establish that they are diverse from Defendant U.S. Bank, depriving the Court of the ability to invoke diversity jurisdiction. *See Herrick*, 251 F.3d at 322–23 ("The party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds for diversity exist and that diversity is complete." (brackets and internal quotation marks omitted)). The Court thus reviews Plaintiffs' state law claims pursuant to its supplemental jurisdiction.

In determining whether to exercise supplemental jurisdiction, a court must "'consider and weigh . . . *at every stage of the litigation*[] the values of judicial economy, convenience, fairness, and comity.'" *Lundy v. Catholic Health Sys. of Long Island Inc.*, ---F.3d---, 2013 WL 765117, at *8 (2d Cir. March 1, 2013) (emphasis added) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349–50 (1988)). "Once all federal claims have been dismissed, the balance of factors will usually point toward a declination." *Id.* (brackets and internal quotation marks omitted)). In this regard, however, this case is an outlier. Given the facially frivolous nature of most of Plaintiffs' state law claims, this Court's exercise of supplemental jurisdiction will not impose costs in terms of judicial economy. Moreover, this Court is, after five years and three complaints, familiar with the Parties and the circumstances, and hence is the forum that can most expeditiously deal with the remaining claims. Given Plaintiffs' misleading practices in this round of the litigation, allowing Plaintiffs another bite at the apple—whether here or in state court—would be unfair to Defendants. And the remaining claims do not present unique or novel questions of New York law; the principle of comity thus does not augur in favor of dismissal without prejudice. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56–57 (2d Cir. 2004) (affirming district court's retention of supplemental jurisdiction where, inter alia, "the [c]ourt ha[d] . . . spent considerable time dealing with the legal issues and becoming fully conversant with the facts"; "the District Court [had previously] expended [judicial resources] to evaluate the enormous record, to craft findings of fact, and to impose remedies"; "defendants [had] take[n] affirmative steps to frustrate any potential enforcement of a judgment against them"; and the state law fraud claim was not novel); *see also Lundy*, 2013 WL 765117 at *8–9 (affirming, in part, district court's exercise of supplemental jurisdiction over, and dismissal with prejudice of, plaintiffs' state law claims).

23

b. U.S. Bank Claims

Plaintiffs' fourth through eighth and fourteenth causes of action are asserted specifically

against U.S. Bank, and have already been dismissed with prejudice.  (Dkt. No. 148.)

c. Fraud Claims

Plaintiffs' ninth, eighteenth, nineteenth, twentieth, and twenty-first causes of action are

all functionally claims for "fraud."  While the precise contours of these fraud claims are unclear,

the claims can functionally be divided into three categories.

First, Plaintiffs raise fraud claims regarding the transfer of their mortgage to and from

U.S. Bank.  (SAC ¶¶ 82–226.)  Such claims have already been dismissed from this proceeding,

but they may be asserted as affirmative defenses in the state foreclosure action.  (Dkt. No. 48.)

Second, Plaintiffs assert fraud claims arising from WCS's and FGCs' conduct during the

loan origination process and at closing.  (SAC ¶¶ 933–954.)  Plaintiffs assert that "Fremont and

WCS Lending misrepresented . . . the material terms of loans to Plaintiffs on September 16,

2005 and prior to closing [on October 12, 2005]," and that "WCS lending and Fremont did not

notify Plaintiffs of changes to the material terms of their loans throughout the loan origination

process."  (SAC ¶ 933.)  Plaintiffs state that they consequently "did not understand the material

terms of the loans until closing or later."  (*Id.*)

Plaintiffs explain that at the outset of the process, WCS led Plaintiffs to believe that they

were entering into a fixed-rate mortgage loan.  (*Id.* ¶ 934.)  Plaintiffs allege that they never

received copies of documents that FGC sent on September 16, 2005, describing an adjustable-

rate loan.  (*Id.* ¶ 946.)  Plaintiffs further assert that they were presented with "fabricated and

fraudulent" documents which "did not accurately reflect the fees and loan terms that WCS

Lending . . . and Fremont . . . knew about."  (*Id.* ¶ 947.)  Indeed, Plaintiffs allege that WCS

24

"prepared two sets of loan applications and disclosure documents," including a "fabricated" set

of documents which "create[d] a false appearance of loan at a lower interest rate."  (*Id.* ¶ 934.)[14]

Plaintiffs state that FGC attempted to disguise its fraud by, inter alia, sending Plaintiffs an

"unsigned letter dated October 11, 2005, one day prior to closing" that "advis[ed] them" of

Fremont's adjustable-rate offer.  (*Id.* ¶ 948.)  Plaintiffs claim that they "discovered for the first

time [at closing] that . . . WCS Lending had originated" two loans, one of which was a "30 year

adjustable rate variable interest loan," and one of which was a "15 year fixed-rate interest, which

had a 2 year prepayment penalt[y] and large balloon payment."  (*Id.* ¶ 934; *see also id.* ¶¶

935–37).  They allege that they were assured at the closing that "[FGC] would refinance their

loans within a few months to lower their monthly payments or interest rates."  (*Id.* ¶ 938.)

Under New York law, in order to survive a motion to dismiss, a plaintiff asserting a fraud

claim must plead facts sufficient to establish the following elements:

> (1) defendant made a representation as to a material fact; (2) such representation
> was false; (3) defendant[ ] intended to deceive plaintiff; (4) plaintiff believed and
> justifiably relied upon the statement and was induced by it to engage in a certain
> course of conduct; and (5) as a result of such reliance plaintiff sustained
> pecuniary loss[.]

*Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. A'ppx 618, 622 (2d Cir. May 18, 2012)

(alteration in original) (quoting *Ross v. Louise Wise Servs., Inc.* 868 N.E.2d 189 (N.Y. 2007)).

The Federal Rules also establish a specific requirement for fraud claims:  A Plaintiff must

"state[] with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

---

[14] The second set of documents allegedly "was submitted to Fremont on September 13, 2005," and Plaintiffs' signatures on these documents were "forged."  (SAC ¶ 944.)  Plaintiffs claim these documents omit information and falsely "state[] that Plaintiffs receive[d] [$1076] net monthly rental income."  (*Id.* ¶ 945; *see also id.* ¶ 951 (noting that "WCS Lending . . . prepared and presented loan applications containing false income information to lenders")).

Plaintiffs' fraud claims based on the loan origination process fail, because Plaintiffs cannot plausibly demonstrate their reasonable reliance on Defendants' alleged misrepresentations.  Plaintiffs admit that, at the very latest, they became aware of the terms of FGC's two loans at the October 12, 2005 closing.  (SAC ¶ 933 (describing that Defendants made misrepresentations regarding the loan "prior to closing" and that Plaintiffs "did not understand the material terms of their loan until closing"); *id.* ¶ 934 (describing that Plaintiffs "discovered" the loan terms for the first time "[a]t closing"); *id.* ¶ 935 (alleging that Plaintiffs learned of the "actual interest rate on their loans" at or immediately prior to closing).)  Furthermore, Plaintiffs undoubtedly understood the terms of the loans before they signed the relevant documents:  They admit that, prior to signing, they discussed the possibility of renegotiating those terms in the following months, (*id.* ¶ 938).[15]  Therefore, even if Plaintiffs are correct that Defendants had previously made statements—even deliberate misrepresentations—to Plaintiffs that Plaintiffs would receive a fixed-rate loan, Plaintiffs could not have reasonably relied on those statements at the closing, when they were confronted with documentary evidence to the contrary.  *See McMorrow v. Dime Sav. Bank of Williamsburg*, 852 N.Y.S.2d 345, 347 (App. Div. 2008) (finding that plaintiff's reliance on "alleged oral misrepresentations" regarding "mortgage payoff amount and prepayment penalties" was "unreasonable in light of the clear, documented written provision in the mortgage agreement stating the penalties for the prepayment of the mortgage and a default"); *Sander v. J.P. Morgan Chase Home Mortg.*, 867 N.Y.S.2d 87, 88 (App. Div. 2008) (rejecting plaintiff's fraud claims against broker of an adjustable rate mortgage "in light of the clear and unambiguous terms of the mortgage documents," and noting that plaintiff had "an

---

[15] Indeed, as noted, Plaintiffs have previously admitted that they were represented by counsel at the closing.  *See Grimes*, 785 F. Supp. 2d at 279.

obligation to exercise ordinary diligence in ascertaining the terms of the document"); *Treeline Garden City Plaza LLC v. UBS Warburg Real Estate Inv. Inc.*, 787 N.Y.S.2d 681, 2004 WL 1305510, at *7 (Sup. Ct. 2004) ("Reliance is not reasonable or justifiable where [p]laintiffs, who were involved in a major transaction, such as this, [had] access to critical information (to wit: the mortgage), but failed to take advantage of that access.").[16]  It is well settled that reliance upon a mortgage broker's or lender's representations "over the clear and unambiguous provisions of the mortgage [is] unreasonable and unjustifiable." *Treeline*, 2004 WL 1305510, at *7.[17]

Perhaps seeing the writing on the wall from this Court's previous description of the loan origination process, *see Grimes*, 785 F. Supp. 2d 277–279, Plaintiffs have offered a variety of subsidiary allegations to buttress this variation of their fraud claim.  These allegations are red herrings.  For example, Plaintiffs state that WCS misrepresented Plaintiffs' income to FGC.  But even if true, this allegation does not substantiate a fraud claim, because it describes a misrepresentation which was made to FGC, not *to Plaintiffs*.  *See Deutche Bank Nat. Trust Co. v. Sinclair*, 891 N.Y.S.2d 445, 447 (App. Div. 2009) ("The Sinclairs' allegation that Contour

---

[16] In deciding Defendants' 12(b)(6) motions, the Court is obligated to accept Plaintiffs' factual assertions as true.  The Court notes, however, that Plaintiffs' current statements regarding the various loan applications and disclosure documents are in tension, if not outright inconsistent, with statements that Plaintiffs previously made to the Court regarding the September 14 loan application and mortgage documents.  *See Grimes*, 785 F. Supp. 2d at 278–79 (noting that "Plaintiffs admit that they signed [mortgage application and disclosure] documents on September 20, 2005" and further explaining that "Plaintiffs do not dispute that they signed" certain documents "on September 20, 2005," all of which indicated that Plaintiffs would receive an adjustable-rate mortgage).

[17] The Court does not address Defendant WCS's argument that by accepting the mortgage and by making mortgage payments for two years, Plaintiffs "ratified all of the disputed terms," (Mem. of Law 12–13 (Dkt. No. 154)).  WCS's ratification argument seems more relevant to the question of whether Plaintiffs could have rescinded the contracts than to the question of whether Plaintiffs were fraudulently induced to enter into the contracts.

procured loans on their behalf by misrepresenting Milicent Sinclair's income to the lenders involved in the transactions does not state a viable cause of action alleging fraud because such misrepresentations were not made to the Sinclairs for the purpose of inducing their reliance."). Plaintiffs also allege that, at the closing, Defendants promised that Plaintiffs would be able to refinance the mortgages.  But this statement also misses the mark, because representations regarding future expectations "are not actionable in fraud."  *See id.* ("[T]o the extent that the Sinclairs' claim is predicated upon Contour's alleged misrepresentations concerning the benefits of refinancing, such misrepresentations are not actionable in fraud because they constitute expressions of future expectations."); *see also Int'l Oil Field Supply Servs. Corp. v. Fadeyi*, 825 N.Y.S.2d 730, 734 (App. Div. 2006) ("[T]he complaint fails to articulate any specific misrepresentation of a material present fact . . . . Vague expression of hope and future expectation provide an insufficient basis upon which to predicate a claim of fraud.")

Third, Plaintiffs assert fraud claims unique to FGC based on FGC's lending practices. Specifically, Plaintiffs assert that from 2003 to 2007, FGC's business model required inducing "Plaintiffs and other borrowers into ever-large loans on increasingly risky terms" despite FGC's knowledge that "these loans were unsustainable . . . and to a certainty would result in a crash that would destroy" homeowners' equity.  (*Id.* ¶ 72.)  According to Plaintiffs, FGC pooled these mortgages and sold the pools for inflated value.  (*Id.* ¶ 73.)  Plaintiffs assert that FGC was obligated to inform Plaintiffs that "the mortgage[s] being offered . . . were, in fact, part of a massive fraud scheme"; Plaintiffs further assert that FGC's involvement in the MERS system facilitated this fraud.[18]  (*Id.* ¶ 75; *see also* SAC ¶¶ 71–76, 227–488, 566–932, 1097–1183.)

---

[18] Given the frivolous nature of this claim, the Court need not provide detail regarding Defendants' alleged involvement in the Mortgage Electronic Registration Systems ("MERS").

There are two problems with this fraud theory.  First, several of the paragraphs in which Plaintiffs describe this strain of their fraud claim, (SAC ¶¶ 69–79), are lifted from the aforementioned complaint filed against Bank of America in California state court, (*Ronald* Compl. ¶¶ 1–11.)  Furthermore, at least a handful of Plaintiffs' allegations regarding FGC's business model, (SAC ¶¶ 227–31), are cribbed from a decision by the United States Bankruptcy Court for the District of Delaware, in which the court described the business practices of an entirely different lending institution, *see DB Structured Prods. v. Am. Home Mortg. Holdings, Inc.* (*In re Am. Home Mortg. Holdings, Inc.*), 402 B.R. 87, 90–91 (Mar. 13 2009).  Literally hundreds of the paragraphs relevant to this claim, (SAC ¶¶ 232–488), are from a class action complaint in California—in this case, at least, filed against FGC, (Second Am. Consolidated Class Action Securities Compl. ¶¶ 1–348 (07-CV-5756 Dkt. (C.D. Cal.))).  And dozens more, (SAC ¶¶ 1097–1183), are borrowed from a complaint filed before the Eastern District of North Carolina against New York Mellon Bank—another nonparty to the instant litigation, (Third Am. Compl. ¶¶ 93–118 (10-CV-0562 (E.D.N.C.))).

This simply will not do.  Because Plaintiffs have not offered any "factual allegations particular to each named Plaintiff, and which reflect that Plaintiff's own personal experiences," in support of this claim, it must be dismissed.  *Wolman v. Catholic Health Sys. of Long Island, Inc.*, No. 10-CV-1326, 2011 WL 1741905, at *3 (E.D.N.Y. May 5, 2011) (explaining that a complaint in which plaintiffs "simply parrot[ed], word-for-word, the vague and conclusory allegations used in more than a dozen actions," filed by Plaintiffs "is a vivid demonstrative of how not to plead" (internal quotation marks omitted)); *see also Fowlkes v. Parker*, No. 08-CV-1198, 2010 WL 5490739, at *4 (N.D.N.Y. Dec. 9, 2010) ("[A] complaint should be dismissed on a Rule 12(b)(6) motion only where the plaintiff has failed to provide some factual basis for the

allegations that support the elements of his or her claim."), *adopted by* 2011 WL 13726 (N.D.N.Y. Jan. 4, 2011).

Second, as a legal matter, this variation of Plaintiffs' fraud claim fails, because it is based on FGC's alleged fraudulent *omissions*: FGC allegedly failed to disclose its securitization of subprime loans. Under New York law, an omission, even if material, does not give rise to a fraud claim absent a fiduciary relationship between the parties. *See Abu Dhabi Commercial Bank v. Morgan Stanley Co. Inc.*, No. 08-CV-7508, 2012 WL 3584278, at *7 n.96 (S.D.N.Y. Aug. 17, 2012) ("[U]nder New York law, it is well-settled that [a]n omission does not constitute fraud unless there is a fiduciary relationship between the parties." (second alteration in original) (internal quotation marks omitted)); *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011) (same); *Cobalt Partners, L.P. v. GSC Capital Corp.*, 944 N.Y.S.2d 30, 35 (App. Div. 2012) (same). It is also well settled under New York law that generally a lender, such as FGC, is not in a fiduciary relationship with the borrower. *See Genna v. Sallie Mae, Inc.*, No. 11-CV-7371, 2012 WL 1339482, at *4 (S.D.N.Y. Apr. 17, 2012) (citing New York law for the propositions that "no [fiduciary] duty generally exists between a lender and a borrower" and that to establish such a relationship, a plaintiff must plead specific "facts to suggest that, despite the general rule, there exists in [his or her] case a fiduciary relationship based upon trust or confidence by one person in the integrity and fidelity of another." (internal quotation marks omitted)). And Plaintiffs have pled no specific facts establishing a unique relationship with FGC. Therefore, Plaintiffs' omission claim cannot sound in fraud.

Plaintiffs' complaint could be construed to state a claim for negligent misrepresentation against FGC, as opposed to fraud. *See Abu Dhabi Commercial Bank v. Morgan Stanley Co. Inc.*, No. 08-CV-7508, 2012 WL 4762039, at *2–4 (S.D.N.Y. Oct. 5, 2012) (noting that under New

York law, a claim for negligent misrepresentation can be based on an omission where the duty

between the parties encompasses a duty "to provide accurate information" and further explaining

that "[i]t is not anomalous that a defendant who made no actionable misstatement might be liable

for negligent misrepresentation but not fraud").  Even so construed, however, Plaintiffs' claim

falls short, because a claim for negligent misrepresentation requires a plaintiff to demonstrate,

inter alia, "the existence of a special privity-like relationship imposing a duty on the defendant to

impart correct information to the plaintiff."  *Mandarin Trading*, 944 N.E.2d at 1109.  To be sure,

such a relationship exists where one party "possesses unique or specialized expertise" or is "in a

special position of confidence and trust with the injured party."  *Id.*  But without more, "[a]

standard lender-borrower relationship is not the kind of special relationship that supports a claim

of negligent misrepresentation."  *Boniel v. U.S. Bank N.A.*, No. 12-CV-3809, 2013 WL 458298,

at *4 (E.D.N.Y. Feb. 6, 2013) (citing *Dobroshi v. Bank of Am., N.A.*, 886 N.Y.S.2d 106 (App.

Div. 2009)).  Plaintiffs have not offered allegations demonstrating that FGC was more than an

arms-length lender; therefore, they have failed to make out a negligent misrepresentation claim.

### d. Remaining Claims

Plaintiffs' tenth and eleventh causes of action are for "equitable estoppel" and "equitable

tolling."  (SAC ¶¶ 1022–1031.)  No such causes of action exist, and these claims are dismissed

with prejudice.  Insofar as Plaintiffs intend to challenge the Court's March 31, 2011 dismissal of

many of their federal claims as time barred, Plaintiffs' arguments are defeated by the law of the

case doctrine.  This Court has already held that, because Plaintiffs failed to allege that

Defendants engaged in deceptive conduct to conceal Plaintiffs' claims, equitable tolling is not

available with respect to Plaintiffs' FHA claim, *see Grimes* 785 F. Supp. 2d at 291, their TILA

claim for damages, *see id.* at 286–87, their RESPA claim, *see id.* at 289, and their ECOA claim,

*see id.* at 294.  "'[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise.'"  *Fermin v. United States*, 859 F. Supp. 2d 590, 600 n.12 (S.D.N.Y. 2012) (quoting *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009)).  Insofar as Plaintiffs intend to invoke equitable tolling in support of their new claims, the Court will address the issue as necessary.

Plaintiffs next assert that Defendants violated New York Banking Law, Section 595-a and the Banking Board's General Regulations.  (SAC ¶¶ 1032–1041.)  There is no basis for Plaintiffs to assert a private cause of action based on these provisions.  *See* N.Y. Banking Law § 595-a (authorizing N.Y. superintendent to impose fines for violations of N.Y. Banking law); *Louros v. Cyr*, 175 F. Supp. 2d 497, 518 (S.D.N.Y. 2001) ("Section 349 [of New York Banking Law] does not provide a private right of action for individuals . . . and plaintiffs do not cite (and could not cite) any authority holding that § 349 provides a private right of action to enforce any New York State law regardless of a plaintiff's standing under that particular law."); *cf. Negrin v. Norwest Mortgage, Inc.*, 263 A.D.2d 39, 46–48 (App. Div. 1999) (recognizing that N.Y. Real Property Law § 274-a creates a private right of action, because, among other reasons, that provision "is not a banking law within the Superintendent's jurisdiction").  This claim is therefore dismissed with prejudice.

Plaintiffs claim that each Defendant engaged in "negligent or wanton hiring, supervision, training or retention" of employees.  (SAC ¶¶ 1042–47.)  This claim is dependent on Plaintiffs' fraud claim, in that Plaintiffs base this claim on the assertion that "Fremont had full and complete knowledge that its employees and agents were engaged in *widespread mortgage fraud* by placing *fraudulent* information as it relates to borrower's income onto its computerized

32

underwiting system and upon the applications of borrowers."  (*Id.* ¶ 1043 (emphases added).)[19]
This claim is thus dismissed with prejudice for the same reasons that Plaintiffs' fraud claims are
dismissed.  Moreover, even if Plaintiffs' fraud claims survived the instant motions, Plaintiffs'
allegations regarding Fremont's and WCS's knowledge of their respective employees'
propensity for fraudulent conduct are wholly conclusory.  This claim is therefore separately
dismissed with prejudice on that basis.  *See Papelino v. Albany Coll. of Pharmacy of Union
Univ.*, 633 F.3d 81, 94 (2d Cir. 2011) ("Under New York law, a plaintiff asserting a claim for
negligent supervision must," allege that, inter alia, "the employer knew or should have known of
the employee's propensity for the tortious conduct").

In their fifteenth cause of action, Plaintiffs assert that Defendants violated their fiduciary
duties to Plaintiffs.  This claim too is dependent on Plaintiffs' fraud claim:  The predicate is that
Defendants "fraudulently induc[ed] [Plaintiffs] to enter into a mortgage transaction which was
contrary to their stated intentions[,] . . . interests[,] . . . and . . . [the] preservation of their
property."  (SAC ¶ 1064; *see also id.* at ¶¶ 1059–67.)  But the claim is also independently
dismissed, because Plaintiffs have failed to establish that either Defendant owed a fiduciary duty.
As discussed, FGC did not owe a fiduciary duty to Plaintiffs.  Nor did WCS.  *See Iannuzzi v.
American Mortg. Network, Inc.*, 727 F. Supp. 2d 125, 138–39 (E.D.N.Y. 2010) ("New York
courts have held that a fiduciary duty generally does not exist between mortgage brokers and
borrowers[,] [but] a broker may take on a fiduciary duty by performing tasks and/or taking on
obligations beyond that of an independent broker or traditional middleman.").

---

[19] The Court notes that this allegation does not, as pled, address WCS.

Plaintiffs next claim that Defendants violated the duty of good faith and fair dealing. Plaintiffs' legal premise—that "[e]ach Defendant was obligated by either contract or common law to act in good faith and to deal fairly with . . . Plaintiffs," (SAC ¶ 1068; *see also id.* ¶ 1075)—is conclusory.  Several of the allegations in support of this claim—that "Defendant Fremont routinely hid and concealed the Note Holder from Plaintiffs so as to prevent them from exercising rights afforded to them by the Note," (SAC ¶ 1071); and that "[u]nbeknownst to Plaintiffs, their signature were [sic] used to create additional debt instruments that purported to obligate them to make payments on loans other than their own toward a securitized pool of mortgages," (*id.* ¶ 1072)—are incoherent.  And the balance of the allegations, (*id.* ¶ 1073), are duplicative of other claims.  This cause of action is thus dismissed.

Plaintiffs also assert an equitable cause of action for unjust enrichment.  "[T]he three elements of an unjust enrichment claim under New York law: "(1) the defendant benefitted; (2) at the plaintiff's expense; and (3) equity and good conscience require restitution." *Fed. Treasury Enters. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. A'ppx 611, 613 (2d Cir. 2010) (ellipsis omitted); *see also Moras v. Marco Polo Network, Inc.*, No. 11-CV-2081, 2012 WL 6700231, at *12 (S.D.N.Y. Dec. 20, 2012) (same).  "Under New York law plaintiffs cannot prevail on an unjust enrichment claim when a valid contract governs the subject matter of a dispute between parties and no 'legal duty independent of the contract itself has been violated.'" *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 331 (S.D.N.Y. 2011) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987)).

To make out their unjust enrichment claim, Plaintiffs take what can best be described as a buckshot approach, and their scattered allegations are insufficient to survive Defendants'

motions.[20]  Plaintiffs allege that Defendants "had an implied contract with . . . Plaintiffs to ensure

that they understood all fees which would be paid to" WCS and FGC.  (SAC ¶ 1078.)  This

allegation fails, both because Plaintiffs have failed to plead an extracontractual or fiduciary

relationship giving rise to this duty, and because Plaintiffs reviewed the terms of the loan at the

very latest at the closing, with their attorney.  *See Grimes*, 785 F. Supp. 2d 279 (noting that

Plaintiffs admitted that "they had their lawyer with them at the closing").  Plaintiffs next assert

that Defendants "cannot, in good conscience and equity, retain the benefits from their actions of

charging a higher interest rate, fees[,] rebates, kickbacks, [and] profits[,] . . . unrelated to the

settlement services provided at closing.  (SAC ¶ 1079.)  This allegation cannot support an unjust

enrichment theory of liability, because the interest rates and fees were governed by the mortgage

contracts.  *See Valentini*, 837 F. Supp. 2d at 331 (finding that plaintiffs' claim that defendants

"charge[d] . . . excessive commissions and margin interest" was not "independent of the

contract" and thus dismissing plaintiffs' unjust enrichment claim (internal quotation marks

omitted)).  Plaintiffs next claim that Defendants will be unjustly enriched through the "monetary

payments from the mortgage payments" and from the "illegal foreclosure" on Plaintiffs' home.

(SAC ¶ 1082.)  Here too, the mortgage rate and the right to foreclose are contractual terms,

neither of which can be the basis for an equitable cause of action.  Finally, Plaintiffs argue that

their loans were "repackaged, reassigned, and/or resold, each with a margin of profit . . . that

---

[20] The allegations in support of this claim are also demonstrably false and/or baseless.
For example, Plaintiffs' assertion that  "Defendants who . . . now hold the home of the Plaintiffs
did not fund the loans," (SAC ¶ 1088), is clearly inapplicable, since Plaintiffs still reside in their
home.  And Plaintiffs' allegation that "all sums advanced to Plaintiffs for loans . . . have been
repaid," (SAC ¶ 1089), is asserted without any documentation or other support.  Plaintiffs also
lifted these allegations—and dozens if not hundreds of other allegations regarding MERS—from
another complaint, filed against MERS in the District Court for the Western District of
Kentucky.  (Compl. ¶¶ 435–46 (Dkt. No. 1 (10-CV-0611 (W.D. Ky))).)

would not otherwise have existed had Plaintiffs not been deceived by the original terms of the loans," (*id.* ¶ 1084); and that "Plaintiffs have paid inflated interest rates that . . . would not have been agreed to but for the failure to understand the documents and [Defendants' failure] otherwise [to] disclose the true terms and costs of the loans," (*id.* ¶ 1085).  The gravamen of these allegations is that Plaintiffs were deceived with respect to the terms of the loans that they received from FGC.  The Court has already explained in the context of Plaintiffs' fraud claims that this theory is belied by Plaintiffs' own allegations to the contrary.  The Court therefore dismisses this claim.

The twenty-second and twenty-third causes of action are for "forgery in the second degree" and "possession of a forged instrument."  (SAC ¶¶ 1184–90.)  Plaintiffs here rely on provisions of New York Penal Law.  No private right of action exists to enforce these provisions. *See Smith v. N.Y.C. Police Dep't*, No. 06-CV-15436, 2010 WL 423039, at *5 (S.D.N.Y. Feb. 4, 2010) ("[A]n individual cannot bring a private cause of action for alleged criminal violations."), *adopted by* 2010 WL 2008839 (S.D.N.Y. May 17, 2010); *see also Reeves v. Wilkins*, No. 10-CV-2766, 2012 WL 3835902, at *6 (E.D.N.Y. Aug. 31, 2012) ("New York does not provide a private cause of action for . . . forgery . . . .").  These claims are consequently dismissed.

In their twenty-fourth cause of action, Plaintiffs assert that Defendants engaged in fraudulent conveyances.  The allegedly wrongful conveyance was "the transfer of mortgage of [Plaintiffs'] real property," (SAC ¶ 1194)—which the Court construes to be the transfer from FGC to U.S. Bank.  Plaintiffs have failed to plead any of the elements necessary to demonstrate that this transfer was wrongful.  *See Fischer v. Sadov Realty Corp.*, 829 N.Y.S.2d 108, 110 (App. Div. 2006) ("To prevail on such a fraudulent conveyance claim, the movant must establish three elements: (1) that the conveyance was made without fair consideration; (2) that at the time of

transfer, the transferor was a defendant in an action for money damages or a judgment in such action had been docketed against him; and (3) that a final judgment has been rendered against the transferor that remains unsatisfied."). This claim is therefore dismissed.

Plaintiffs next assert a cause of action for usury and fraud.[21] This claim fails as to WCS, because usury generally cannot be asserted against a mortgage broker, and Plaintiffs have not identified anything that would justify a departure from this rule here. *See Huggins v. Greenblatt*, 634 N.Y.S.2d 517, 518 (App. Div. 1995) (noting that under N.Y. General Obligations Law, "brokers . . . are not proper parties to [a usury] cause of action"). Moreover, the claim fails as to all Defendants, because Plaintiffs failed to plead that FGC's interest rates were usurious. "Under New York law, a transaction is civilly usurious only when it imposes an annual interest rate exceeding 16% per annum." *Prowley v. Hemar Ins. Corp. of Am.*, No. 05-CV-0981, 2010 WL 1848222, at *4 (S.D.N.Y. May 7, 2010) (citing N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a); *Rosewell Capital Partners LLC v. Alternative Constr. Techs.*, No. 08-CV-10647, 2009 WL 222348, at *15 (S.D.N.Y. Jan. 30, 2009). Plaintiffs did not allege that the rate for either FGC loan did or *could* exceed the 16% threshold.[22] Plaintiffs also failed otherwise to

---

[21] The Court construes this to be a claim for civil, as opposed to criminal, usury, since criminal usury is a defense, not an affirmative cause of action. *See Scantek Med., Inc. v. Sabella*, 582 F. Supp. 2d 472, 474 (S.D.N.Y. 2008) (explaining that "criminal usury is strictly an affirmative defense" and citing New York authority for the proposition that a plaintiff cannot "improperly use" the "shield" of criminal usury "as a sword").

[22] The Court has independently reviewed the loan application incorporated into the Second Amended Complaint. It appears from these documents that FGC's interest rates were not usurious. The initial interest rate for Plaintiffs' adjustable-rate loan was "8.45%," and the interest rate for Plaintiff's fixed-rate loan was "12.45%." *See Grimes*, 785 F. Supp. 2d at 278. The fixed-rate loan clearly was not usurious. And the Court reads the loan application to cap Plaintiffs' adjustable-rate loan below 16% per annum. (First Am. Compl. Ex. 13.) Again, Plaintiffs have not alleged otherwise.

identify any theory of either FGC's or WCS's usurious conduct.  This claim is thus dismissed.

Plaintiffs' penultimate cause of action is for intentional infliction of emotional distress ("IIED").  Defendants allegedly committed outrageous conduct when "U.S. Bank pretended to transfer the mortgage to the Defendant Trust . . . so [the Trustee] could record a fraudulent Notice of Default," such that U.S. Bank could initiate a foreclosure proceeding against Plaintiffs. (SAC ¶¶ 1206–11.)  At the outset, this conduct is not attributed to WCS or FGC, and the claim is dismissed on that basis alone.  Furthermore, the foreclosure action was initiated in 2006, and under New York law, an IIED claim has a one-year statute of limitations, *see Patterson v. Balsamico*, 440 F.3d 104, 112 n.4 (2d Cir. 2006).  Plaintiffs did not plead this claim until the Second Amended Complaint in 2011; consequently, the claim is time barred and dismissed.

But even if the Court construed this claim to encompass the original transfer of the mortgage from FGC to U.S. Bank—and even if Plaintiffs were entitled to invoke equitable tolling based on their conclusory allegations of Defendants' joint conspiracy to disguise their fraudulent transfers of the mortgage (which scheme the Court would have to assume Plaintiffs discovered only within the twelve-month period prior to filing the Second Amended Complaint)—Plaintiffs' allegations would still fail to establish Plaintiffs' IIED claim.  Courts have held that, under New York law, egregious debt collection efforts can give rise to an IIED claim, *see Assocs. First Capital v. Crabill*, 51 A.D.3d 1186, 1188 (App. Div. 2008) (explaining that "a dispute over indebtedness and concomitant collection efforts may . . . justify a cause of action for the intentional infliction of emotional distress"), but only if the collection efforts "fall to . . . a level of loathsome conduct," *id.*  Moreover, courts have generally found that an IIED claim will not lie in a case, such as this one, where a debt collection effort or a foreclosure results in inconvenience, frustration, embarrassment, and stress, but not serious mental anguish.

*See id.* at 1188–89 (finding in the "subprime mortgage refinancing" context, that the initiation of a foreclosure proceeding, and the attendant "frustrations in trying to resolve the disputed amount, threats of foreclosures . . ., phone calls placed to the workplace . . . that were embarrassing and upsetting, misrepresentations as to the amount owed, and stress resulting from the ongoing dispute . . . did not meet the rigorous . . . and difficult to satisfy requirements for a viable cause of action for intentional infliction of emotional distress" (fourth ellipsis in original) (internal quotation marks omitted)); *see also Glatter v. Chase Manhattan Bank*, 669 N.Y.S.2d 651, 652, 654 (App. Div. 1998) (finding that defendant bank's conduct, which cast a "cloud upon the title to Plaintiff's home," and which the court characterized as "reprehensible," nonetheless "did not rise to the level of extreme and outrageous conduct, so transcending the bounds of decency as to be intolerable in a civilized society, such that it would support a claim for intentional infliction of emotional distress"); *Ford Motor Credit Co. v. Hickey Ford Sales*, 463 N.Y.S.2d 639, 640 (App. Div. 1983) (finding that creditor's actions against borrower's home, which resulted in "inconvenience, embarrassment and emotional distress," and "placed [the borrowers] in an unpleasant climate for almost a year" did not support an IIED claim). *See generally Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993) (describing that "'[t]he requirements of the rule [for an IIED tort] are rigorous and difficult to satisfy'" and noting that "of the intentional infliction of emotional distress claims considered by [the New York Court of Appeals], every one has failed because the alleged conduct was not sufficiently outrageous"). This claim is thus dismissed.

And Plaintiffs' final claim is for "OUTRAGE." (SAC ¶¶ 1212–15 (emphasis added).) The Court has searched for, but has not found, such a claim in the annals of Federal or New York law. Furthermore, the allegations in support of this claim are entirely duplicative of

Plaintiffs' IIED claim.  Therefore, the twenty-seventh cause of action is also dismissed.

### III. Conclusion

For the reasons stated herein, Defendants' motions to dismiss are granted.  The Second

Amended Complaint is dismissed in its entirety with prejudice pursuant to Federal Rules of Civil

Procedure 8 and 12.  The Clerk of Court is respectfully directed to terminate the pending

motions, (Dkt. Nos. 152, 155), and close this case.

SO ORDERED.

DATED:        White Plains, New York
             March 22 , 2013

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List (via Mail)
Darrick and Yolanda Grimes
23 Stacy Lee Dive
Newburgh, NY 12550
*Pro Se Plaintiffs*

Kenneth J. Flickinger, Esq.
Knuckles, Komosinski & Elliot, LLP
565 Taxter Road, Suite 590
Elmsford, NY 10523
(914) 220-0155
Fax: (914) 366-0080
Email: kjf@kkselaw.com
*Counsel for Defendants Fremont General Corporation and Fremont Investment and Loan*

Matthew J. Bizzaro, Esq.
Noah Nurnberg, Esq.
L'Abbate, Balkan, Colavita & Conti
1001 Franklin Avenue, 3rd Floor
Garden City, NY 11530
(516) 294-8844
Fax: (516) 296-7111
Email: mbizzaro@lbcclaw.com
*Counsel for Defendant WCS Lending, LLC*

Steven M. Hecht, Esq.
Lowenstein Sandler PC
1251 Avenue of the Americas, 18th Floor
New York, NY 10020
(973) 597-2500
Fax: (973) 597-2381
Email: shecht@lowenstein.com
*Counsel for Defendant U.S. Bank, National Association, as Trustee for Master Asset Backed Securities Trust 2006-FRE-1*

41